## 20019

The STATE, Respondent, v. John Ian SACHS, Appellant

(216 S. E. (2d) 501)

544

*Belser, Belser, Baker, Barwick & Toal,* of Columbia, *for Appellant,*

548

*Messrs. Daniel R. McLeod, Atty. Gen., Robert M. Ariail,
Asst. Atty. Gen., Richard P. Wilson, Staff Atty.,* and *John
W. Foard, Sol.,* of Columbia, *for Respondent,*

*Belser, Belser, Baker, Barwick & Toal,* of Columbia, *for Appellant,* in Reply.

May 27, 1975.

NESS, Acting Associate Justice:

This is an appeal from convictions of possession with intent to distribute a quantity of hashish, possession of a quantity of amphetamines, and possession of a barbiturate. The salient facts involving this case of international drug trafficking follow.

A package mailed from a location in West Germany addressed to Susan Sachs, sister of appellant, Percival Road, Columbia, containing approximately one kilogram of hashish was intercepted and examined by United States Customs agents at the Port of New York. Thereafter, on September 7, 1972, the package was forwarded to the Post Office in Columbia. Claude McDonald, a special agent for the U. S. Customs, Treasury Department, met with Columbia Postal officials and local law enforcement authorities at the Columbia Post Office. The box was again opened and a chemical analysis revealed the contents to be hashish. The package was delivered to Miss Sach's apartment later that day in the ordinary course of mail service. When Miss Sachs arrived home, she carried the package inside. Approximately one hour later, agent McDonald, accompanied by local authorities, entered Miss Sachs' apartment pursuant to a federal search warrant. The package was discovered but it remained unopened. Miss Sachs protested her innocence of any involvement with the package, remonstrating that her brother, the appellant had told her he was expecting a package from Germany. Based on the fact that the package was unopened and the conversation, she was not placed under arrest, but was requested to assist by delivering the package to appellant. She consented.

The appellant, Sachs was residing at the residence of Mr. and Mrs. William Chandler, 1932 Pendleton Street, Columbia. Miss Sachs with agent McDonald and local officers drove by the Pendleton Street address so that they would be able to adequately describe the residence for a search warrant. They proceeded to the federal courthouse where a warrant was issued by the United States Magistrate. A state warrant was also obtained by state authorities from a ministerial recorder. Miss Sachs made an abortive attempt to deliver the package at about nine that night, but no one was home. Approximately two hours later she delivered the package and fifteen minutes thereafter, a search by federal, state and local officials ensued. Evidence essential to the convictions was uncovered during the search.

Appellant has challenged the sufficiency of the state search warrant on numerous grounds, any of which, if sustained, would invalidate the search under such authority. We consider these objections seriatim.

The state warrant was issued by a ministerial recorder of the City of Columbia. Appellant advances the argument that, although the city was authorized to appoint only one ministerial recorder, numerous ones were appointed. Since the person in controversy was neither the first nor the last, his appointment is a nullity. Act Number 161, Acts and Joint Resolutions (1965) provides for ministerial recorders. It speaks of "a ministerial recorder" and "the person" elected.

Does this restrict the appointment to a single ministerial recorder? The question of the proper construction of this language has been resolved by § 30-203 of the South Carolina Code (1962). It states *inter alia* "The words 'person' and 'party' and any other word importing the singular number used in any act or joint resolution shall be held to include the plural . . ." As a matter of convenience the General Assembly, when enacting legislation dealing with appointments, does not encumber the Code with "person or persons" or "recorder or recorders". Furthermore, the obvious intent was to make available recorders to issue warrants when appropriate. It is inconceivable that one person for each city would fulfill this objective.[1]

Another attack upon the statutory authority of the ministerial recorder is directed to § 15-922 which grants the ministerial recorder the following power; "to issue summonses, subpoenas, arrest warrants and search warrants in all cases arising under the ordinances of the

---

[1] At oral argument appellant contended that the City of Columbia only needed one ministerial recorder. The act has statewide applicability. The legislative intent would not be circumscribed by the needs of Columbia. That is left to the Columbia City Council which apparently disagrees with the appellant.

municipality in which the office is created and in criminal cases as are now conferred by law upon magistrates . . ." Appellant argues that the reference to magistrates deals with the authority of magistrates to try cases. The entire provision is concerned with the issuance of summons and warrants. We should not assume that the reference to magistrates was cryptically dealing with their trial jurisdiction. Offenses within the limited trial jurisdiction of magistrates seldom require search warrants. It would require a strained interpretation of the statute to find that the legislature was restricting the ministerial recorders' authority to the cases a magistrate might try. The obvious intent, to provide for proper persons to pass upon warrant requests for general criminal offenses, would be thwarted by such a narrow construction.

Appellant further argues that § 17-271, the general statute authorizing warrants, does not specifically include a ministerial recorder as an issuing authority. Nevertheless, the concluding sentence of that Section states: "This section is not intended to and does not either modify or limit any statute or other law regulating search, seizure, and the issuance and execution of search warrants in circumstances for which special provision is made." Additionally, the Section merely confers authority; it does not prohibit other authorization. Hence, appellant's position is unavailing.

Did the issuance of the warrant contravene the state and federal constitutional requirement that the warrant be issued by a neutral and detached magistrate? The most well known recent case discussing this requirement is *Coolidge v. New Hampshire,* 403 U. S. 443, 91 A S. Ct. 2022, 29 L. Ed. (2d) 564 (1971). In *Coolidge,* the attorney general, the chief prosecutorial officer of the state, issued a search warrant. This was held invalid because "prosecutors and policemen simply cannot be asked to maintain the requisite neutrality with regard to their own investigations—the 'competitive enterprise' that must rightly

engage their single-minded attention." Id. p. 2029-30. Further, the fact that a neutral magistrate would have found probable cause on the same set of circumstances would not cure an otherwise defective warrant. The security of one's privacy—the core of the warrant requirement—is protected against arbitrary decisions by the police by interposing a neutral magistrate between the request for a warrant and execution.

Recently the Supreme Court has applied this rationale to a factual setting similar to the instant case. In *Shadwick v. City of Tampa,* 407 U. S. 345, 92A S. Ct. 2119, 32 L. Ed. (2d) 783 (1972) the court considered whether a municipal court clerk, appointed by the city clerk, an official of the executive arm of government, could issue warrants. In upholding the warrant, the court indicated the neutrality requirement was satisfied so long as there was "no connection with any law enforcement activity or authority which would distort the independent judgment the Fourth Amendment requires." Id. p. 2123.

In the only reported federal case interpreting this pronouncement, the question was whether a commanding officer, an executive as opposed to a judicial official, could issue warrants. In holding that he could, the court observed: "To be sure he is responsible for the maintenance of order and discipline within his command. This does not mean that he is partial, prejudiced and biased. There is no reason to suppose that he would be less willing than a magistrate that there be a fair and just administration of the law." *Wallis v. O'Kier,* 491 F. (2d) 1323 (10th Cir. 1974). See also *United States ex rel. Gaugler v. Brierley,* 477 F. (2d) 516 (3rd Cir. 1973); *United States v. Steed,* 465 F. (2d) 1310 (9th Cir. 1972); *Albitez v. Beto,* 465 F. (2d) 954 (5th Cir. 1972).

The nucleus of the neutrality requirement is that the issuing officer not be functioning in a capacity charged with the duty of investigating or prosecut-

ing crimes. Appellant contends that this ministerial recorder fails to pass the neutrality test for two reasons. First, his office, due to inadequate space, was co-located with the violations bureau of the police department where fines were collected. That this did not influence the ministerial recorder is illustrated by the facts surrounding the issuance. He questioned the affiant, a police detective, for ten to fifteen minutes. This took place in the seclusion of the Clerk of Court's office.[2] The ministerial recorder conscientiously adhered to his judicial duties.

Secondly, appellant insists that the ministerial recorder's duties as a probation officer conflict with the neutrality requirement. The testimony revealed that as a probation officer he was directly responsible to the municipal court judge.[3] As such, he was a quasi-judicial official. His duties were exclusively post conviction, the thrust of being rehabilitative. In no way was he entangled with the "competitive enterprise of ferreting out crime."[4] *Johnson v. United States,* 333 U. S. 10, 68 S. Ct. 367, 92 L. Ed. 436 (1948).

Appellant has attempted to distinguish *Shadwick* in that the authority of the clerk in that case was for narrowly defined offenses. Nevertheless, that factor would not diminish the neutrality requirement. Whether a search is for a felony or misdemeanor, the intrusion of privacy is potentially the same. *Coolidge, supra,* identified this as the core of the warrant requirement.[5]

---

[2] The City has provided a new modern facility and this situation no longer exists. Shadwick (in footnotes 11 & 12) recognizes the diverse demands for law enforcement on state administrations.

[3] He also assisted the clerk of court. In the discharge of those duties he was at times answerable to the clerk. Appellant has not asserted that those duties were conflicting with the constitutional requirement.

[4] Appellant was incorrect in believing that as a city probation officer, the ministerial recorder had the authority to arrest persons. The statute relied upon § 55-578 applies to probation officers appointed by the Probation and Parole Board.

[5] Appellant's contention would be properly directed to the second phase of the *Shadwick* test—that the magistrate be capable of determining whether probable cause exists for the particular offense. This question was not raised in the instant appeal.

Accordingly, the ministerial recorder fully qualified as a neutral and detached magistrate. The South Carolina constitutional requirement is identical in language to the Fourth Amendment to the United States Constitution and imposes no greater restraint upon the issuance of warrants.

The next alleged error in the issuance of the warrant deals with two inaccuracies in the affidavit of the city detective. The United States Supreme Court has never passed directly on the extent a reviewing court may be constitutionally required to determine the veracity of the facts supporting a search warrant when the warrant is valid on its face. *Rugendorf v. United States,* 376 U. S. 528, 84 S. Ct. 825, 11 L. Ed. (2d) 887 (1964). Although to inquire into the veracity reduces the function of a magistrate to a mere formality, most federal courts have deemed it proper. If any of the facts are erroneous, the courts consider such things as whether the factual error was made by a state official or a private citizen; whether the error was negligent or an intentional misrepresentation; whether probable cause was demonstrated without the aid of the erroneous recitation; and whether parole testimony by affirmation cures the error. Leading authorities are not uniform in their view of the problem. See *United States v. Damitz,* 495 F. (2d) 50 (9th Cir. 1974) ; *United States v. Carmichael,* 489 F. (2d) 979 (7th Cir. 1972) ; *United States v. Thomas,* 489 F. (2d) 664 (5th Cir. 1973) ; *United States v. Gonzalez,* 488 F. (2d) 833 (2nd Cir. 1973) ; *United States v. Morris,* 477 F. (2d) 657 (5th Cir. 1973) ; Kipperman, Inaccurate Search Warrants Affidavits as a Ground for Supporting Evidence, 84 Harv. L. Rev. 825 (1971).

Of course, all that is necessary to justify the issuance of a warrant is probable cause. The Supreme Court has specifically accepted hearsay as proper to support a warrant so long as the magistrate is afforded a basis for determining the credibility of the informer. *United States v. Harris,* 403 U. S. 573, 91A S. Ct. 2075, 29 L. Ed. (2d) 723 (1971) ; *Spinelli v. United States,* 393 U. S. 410,

89 S. Ct. 584, 21 L. Ed. (2d) 637 (1969); *Aguilar v. Texas,* 378 U. S. 108, 84A S. Ct. 1509, 12 L. Ed. (2d) 723 (1964).

Therefore, it would be a curious anomaly to erect a rigid standard that if the facts relied upon prove to be erroneous, the warrant is invalid. Mere error in the facts relied upon does not offend the protection sought to be achieved by the warrant requirement. Absolute privacy is not guaranteed by the Fourteenth Amendment. *Coolidge, supra.* Hindsight invalidation of the warrant would be incompatible with the legitimate demands of law enforcement.

Mindful of the divergent views of the federal circuits, we believe the appropriate test to be as follows: Did the officer, or other government official, in such capacity, intentionally, recklessly, or in bad faith recite facts he knew or should have known to be erroneous, without correcting the error by additional affidavit or affirmation, to obtain the issuance of a warrant? The same standard applies to the officer or other governmental official whether the facts relied upon are of his personal knowledge or of facts supplied to him by an informant. However, even if the officer was delict, so long as probable cause was established by affidavit or affirmation without the aid of the erroneous fact, the warrant satisfies the constitutional demands.

Exclusion of evidence is not the only means available to insure that warrants are properly issued. Disciplinary action or an indictment, if proper, may follow against an officer violating this standard. A defendant, who has no reason to complain about a search warrant upon probable cause, is not to be effectively granted immunity from prosecution. The standard recognized today eliminates any enticement for the officer to circumvent the probable cause requirement. We believe this promotes the basic deterrence objective of the federal exclusionary rule without uselessly depriving the state of the value of probative

evidence. In the marginal area, where the warrant is independently supported by probable cause without relying on the erroneous facts, the defendant is not in a position to complain. Deterrence by exclusion of evidence at trial does not preponderate over the need for use of evidence for the jury to reach a just verdict. See our discussion of the exclusionary rule *infra.*

The pertinent portion of the affidavit in the instant case stated:

"Federal Customs agents, after having discovered a quantity of Hashish in a package, informed the deponent of same, and that the intended recipient of the package was one Susan Sachs who upon receipt, in turn *delivered the package to* its intended receiver, one John Sachs at the above stated address. This information and observation is of the deponent's *own personal knowledge*." (Emphasis added.)

The two grounds upon which appellant assails the affidavit are: first, at the time the affidavit was executed, the package had not been delivered. Second, the affiant had no personal knowledge of the delivery. Both the affidavit for the state and federal warrants were typed by Susan Sachs at the federal courthouse. The federal warrant indicated the package was to be delivered. Thus, the error in the state affidavit was not part of a plan to circumvent the probable cause requirement.

One reason advanced for the error is that when the affidavit was being prepared, the officer anticipated that the package would have been delivered by the time the affidavit was executed. This is consistent with the testimony dealing with the delivery plan. The federal agent, armed with a search warrant, and Miss Sachs were to proceed from the federal courthouse in downtown Columbia to the Pendleton Street address, a short distance away, to deliver the package. The city detective went from the federal courthouse to the ministerial recorder's office to obtain a warrant and join the other officers in the search. During the appearance before

the ministerial recorder, the detective stated that the package was to be delivered. The ministerial recorder was fully appraised of the plan for delivery.

The only portion of the affidavit which was not of the affiant's own personal knowledge was that part dealing with the delivery. The ministerial recorder was informed by the affiant that the delivery was under the supervision of other police officers. This in itself would meet the reliability aspect of *Aguilar, supra. United States v. Steed,* 465 F. (2d) 1310, 1315 (9th Cir. 1972). Of course, a warrant does not offend the constitution so long as it is issued upon affidavit or *affirmation*. There was no intention to deceive the ministerial recorder and his decision to issue the warrant was based upon probable cause.

The final attack on the warrant is that Code § 17-271 requires that the warrant be issued only upon affidavit. While the *dicta* in the case of *State v. York,* 250 S. C. 30, 156 S. E. (2d) 326 (1967) may be read as indicating that an exclusionary rule would be applied to evidence obtained pursuant to a statutorily defective warrant, we reserved that question in *State v. Williams,* 262 S. C. 186, 203 S. E. (2d) 436 (1974).

Much of our discussion of the exclusionary rule, *infra,* is relevant to this inquiry. The statute, like the constitution, deals with the issuance of warrants. It does not direct itself at all to the exclusion of evidence. The purpose of the statute is to provide for timely recording of facts presented to a judicial officer. Memories wane and facts will often not be available when the issue of probable cause is raised at a preliminary hearing or at trial. Thus, the primary benefit of the statute is to the person arrested or searched and to the general public. When properly complied with, the police also benefit. This has a very wholesome, salutary effect on our criminal process.

Accordingly, before evidence, resulting from an arrest or search authorized by warrant upon affirmation, may be admitted, the state must demonstrate a

good faith attempt to comply with the statute. Furthermore, if a defendant is prejudiced in his attack upon a warrant due to the failure of the affiant or the magistrate to remember the testimony upon affirmation that supported probable cause, evidence stemming from the search or arrest must not be admitted.

Appellant in his attack upon the state warrant did not raise the issue of whether probable cause can exist when the delivery is anticipatory. For discussion of this issue see, Footnote 12 at p. 566 of this opinion.

In the instant case the affiant attempted to set forth the facts supporting the warrant in an affidavit. The city law enforcement agents did not have complete control of the delivery. The error in the affidavit was a necessary hazard encountered when federal and state authorities searched in a joint effort. The affidavit satisfied the good faith attempt to comply with the statute. The appellant was not prejudiced due to the error in his attack upon the issuance of the warrant. The city detective and ministerial recorder were able to recount the testimony upon affirmation by the city detective that supported the issuance of the warrant. Thus, appellant's arguments pale in the light of the circumstances surrounding the issuance of the search warrant in this case.

Prior to reaching the other allegations of error, we believe it provident to discuss the introduction of evidence under the authority of the federal warrant. Appellant's only objection at trial to the federal warrant was that it was not relevant. Neither side briefed this issue nor asserted it at oral argument. Because it represents a matter of novel impression in this jurisdiction, we requested supplemental briefs.

Appellant first contends that the question not having been raised by The State on appeal, it is not properly before us. Supreme Court Rule 4, § 8 provides:

"While respondent may be restricted in argument to such additional sustaining grounds as noticed by him, this Court reserves the right to sustain any ruling, order or judgment upon any grounds appearing in the record." This rule has recently been applied in a number of cases, some of which, but for the rule, an opposite ruling may have resulted. *Jeanes v. Jeanes,* 255 S. C. 161, 177 S. E. (2d) 537 (1970); *Glenn v. E. I. DuPont de Nemours & Company, Inc.,* 250 S. C. 323, 157 S. E. (2d) 630 (1967). See *South Carolina National Bank v. Florence Sporting Goods, Inc.,* 241 S. C. 110, 127 S. E. (2d) 199 (1962). Since the federal warrant and supporting affidavit were introduced into evidence, the propriety of the search and the introduction of evidence resulting therefrom is properly before this Court.

Obviously, in analyzing this matter we are concerned with the role of the exclusionary rule in a state criminal proceeding. Since the efficacy of the exclusionary rule in the case of a joint search by federal and local authorities pursuant to a federal warrant is a matter of novel impression in this jurisdiction it is appropriate to briefly assay the development of the exclusionary rule, gleaning therefrom the objectives which undergird the rule.

For years evidence obtained by searches in violation of constitutional guarantees was admissible at trial. The Fourth Amendment does not contain an exclusionary rule, however, in *Weeks v. United States,* 232 U. S. 383, 34 S. Ct. 341, 58 L. Ed. 652 (1914), the court unanimously held that evidence of criminality obtained in violation of the amendment must be excluded from trials in federal courts, and such a provision was incorporated by judicial implication for federal trials when a search had been conducted by federal officers.

The rule was justified as protecting the integrity of federal court proceedings by not sanctioning official lawlessness. Additionally, it was designed to compel respect for the constitution by removing the incentive to violate it. "Its

purpose", the court has said; "is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it". *Elkins v. United States,* 364 U. S. 206, 217, 80A S. Ct. 1437, 1444, 4 L. Ed. (2d) 1669 (1960). The court believed the exclusionary rule the only effective available way to compel respect for the constitutional right against unreasonable search and seizures.

The *Weeks* case applied only to federal cases. For the time being the states were left free to accept, modify or reject the exclusionary rule. While exclusion generally remained a discretionary matter with state tribunals, a state could not affirmatively sanction illegal search and seizures without violating the Fourteenth Amendment due process clause, but the exclusionary rule of evidence was not viewed as a part of the concept of due process of law. It seemed to be viewed by the Supreme Court as an evidentiary device adopted to enforce the Fourth Amendment, but not as an integral part of the Fourth Amendment. *Wolf v. Colorado,* 338 U. S. 25, 69 S. Ct. 1359, 93 L. Ed. 1782 (1949).

A slight majority of the states totally rejected the exclusionary rule, while a substantial minority adopted some form of exclusion. *Elkins v. United States, supra.* The states that continued to admit the so called "tainted" evidence believed it improvident to deny the jury the benefit of untrammeled disclosure of highly probative evidence, usually essential for the prosecution, merely because improper methods were used to obtain the evidence. *State v. Anderson,* 230 S. C. 191, 95 S. E. (2d) 164 (1956). Other reasons impelled admission. There was no convincing authority that the rule would deter lawless searches. It was an experiment at best. Furthermore, the exclusionary rule would afford no relief to persons who had been subjected to a lawless, but fruitless search. Yet it necessarily embraced the idea of release of criminals, a high price to extract from society. A single Cardoza sentence capsulized the objection of the rule,

"The criminal is to go free because the constable has blundered." *State v. Defore,* 242 N. Y. 13, 21, 150 N. E. 585, 587 (1926).

Obviously, federal and state courts were operating under different restraints. Inevitably a common practice developed whereby evidence seized by state officials in a manner inconsistent with the constitutional requirements applicable to federal officers would be offered to those officials for use in federal prosecutions. A suppression hearing would be ordered, but the sole focus would be whether there had been sufficient federal involvement in the search for it to be denominated a "federal" one. If not, the evidence was not barred. *Byars v. United States,* 273 U. S. 28, 47 S. Ct. 248, 71 L. Ed. 520 (1927). This encouraged illegality. Federal prosecutions parasitically thrived on "tainted" evidence. In effect, the case was being handed to the federal authorities on a "silver platter", a term Justice Frankfurter used to denote this practice. *Lustig v. United States,* 338 U. S. 74, 69 S. Ct. 1372, 93 L. Ed. 1819 (1949). Years later the practice was interred. *Elkins v. United States, supra.* On occasion, the reverse situation occurred. In these cases, evidence seized by federal officers in violation of the Fourth Amendment was delivered to state officers for prosecution. *Rea v. United States,* 350 U. S. 214, 76 S. Ct. 292, 100 L. Ed. 233 (1956); *Rios v. United States,* 364 U. S. 253, 80 S. Ct. 1431, 4 L. Ed. (2d) 1688 (1960); *Wilson v. Schnettler,* 365 U. S. 381, 81 S. Ct. 632, 5 L. Ed. (2d) 620 (1961). This technique soon became known as the "reverse silver platter." It encouraged an equally offensive procedure of circumventing the Constitution. Finally, the exclusionary quilt was tacked when in *Mapp v. Ohio,* 367 U. S. 643, 81 S. Ct. 1684, 6 L. Ed. (2d) 1081 (1961) the court, basing its decision principally on the *Weeks-Elkins* rationale, reversed *Wolf, supra,* and incorporated the exclusionary rule into the Four-

teenth Amendment.[6] Since that time evidence seized inconsistent with *constitutional* protections had been excluded, regardless of the court and of whether the official is local, state or federal.

The exclusionary rule has had an uneven and disjointed development; however, it was never meant to antagonize federal and state relations. On the contrary, the very cases proclaiming the rule evince a recurring theme concerning the proper relationship. "Free and open cooperation between state and federal law enforcement officers is to be commended and encouraged." *Elkins, supra,* 80A S. Ct. p. 1446. Further, "[t]he very essence of a healthy federalism depends upon the avoidance of needless conflict between state and federal courts." Id. *Mapp, supra,* 81 S. Ct. p. 1693. Thus, the Supreme Court has recognized the need for federal-state adjuvancy.

The search of the Pendleton Street residence was a joint co-operative effort in which local officers assisted federal officials. Indeed, the state officers were alerted to the presence of the contraband by the federal officials. Earlier in the day the search of Miss Sach's apartment by federal and state authorities had been based solely on the federal warrant. Federal agent McDonald was responsible for interrogating Miss Sachs. It was McDonald who proposed the delivery of the package to the appellant by Miss Sachs. Miss Sachs was with the federal agent McDonald from the afternoon search of her apartment until delivery of the package at eleven that night. Mr. McDonald served the federal warrant. A state warrant was also served. Both authorized a search for the same substance. The justification, timing, and scope of the search were identical. Federal customs agents searched the upstairs area, as did state authorities.

---

[6] The durability of the exclusionary rule as being constitutionally imbedded is questionable. In *United States v. Calandra,* 414 U. S. 338, 94 S. Ct. 613, 38 L. Ed (2d) 561 (1974), Justice Powell writing for a six man majority, referred to the rule as a "judicially-created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." at 620.

Agent McDonald checked the living room, as did state authorities. There was no greater invasion due to the presence of the state officers. In reality there was but a single search.[7]

At trial the appellant did not assail the issuance of the federal warrant. Our initial inquiry is whether a joint search was constitutionally permissible under that warrant. A number of cases have recognized that a joint search may be supported by a single warrant. In some of these cases the federal court has refused to permit introduction of evidence in a federal prosecution although such evidence would be admissible in a state court.[8] Nevertheless, the cases recognize that introduction of such evidence is constitutionally permissible. In *Navarro v. United States,* 400 F. (2d) 315 (5th Cir. 1968) federal agents assisted state agents in a joint search. The court recognized that the search was constitutionally valid. Because the search did not comply with the federal rules, the resulting evidence could not be introduced in federal court. Later *Navarro* sought injunctive relief concerning the introduction of evidence in state court. This was denied. The search complied with the constitution; it had only violated the more formalized federal procedure. *United States v. Navarro,* 429 F. (2d) 928 (5th Cir. 1970). *Navarro's* case reached the Fifth Circuit Court of Appeals a third time. Once again the court firmly stated

---

[7] We are not presented with a case where a simultaneous search is for unrelated items, the scope of which is different. *United States v. Carney,* D. C. Tenn., 356 F. Supp. 855 (1973).

[8] This may appear to offend the cooperation envisioned in *Elkins* and *Mapp, supra.* Upon closer examination it appears that contrariety of views of the Federal Rules of Criminal Procedure has spawned these divergent results. Some courts have held that the rules are not merely admonitory, but have the force of law. Since violation may encourage a limited "silver platter" situation, evidence should not be admitted. *Navarro v. United States, supra.* Others have recognized that *Elkins* and *Mapp,* are concerned primarily with constitutional, not statutory violations, and reject *Rea v. United States, supra,* as requiring exclusion. *United States v. Sellers,* 483 F. (2d) 37 (5th Cir. 1973); *United States v. Harrington,* 504 F. (2d) 130 (7th Cir. 1974).

that the search was constitutional. *United States v. Navarro*, 441 F. (2d) 409 (5th Cir. 1971).[9]

*United States v. Sellers, supra,* presents another joint search situation. Appellants were convicted in federal court of violating a federal statute dealing with transmission of wagering information by using a wire communication facility. The search had been supported by a state warrant that did not satisfy the federal rules requirement. Nevertheless, the conviction was upheld. The decision assumes the use of the evidence was constitutionally permissible. The same result is reached in *United States v. Harrington, supra,* when a state warrant failed to satisfy the execution, service and return requirements of Rule 41.[10]

Accordingly, federal officers assisting state officers pursuant to a state warrant presents no constitutional infirmities. In light of the federal-state relations hoped for in *Elkins* and *Mapp,* the contrary view would be a startling proposition. Likewise, we perceive of no constitutional impediment to state officers assisting federal officers pursuant to a federal warrant so long as the search is simultaneous and identical in scope.

Are there any reasons why we should apply the exclusionary rule of our own accord in the instant case? The federal warrant was issued by Thomas Simpson, a U. S. Magistrate and a member of the bar of this State since 1950. Under current state procedure a warrant may be

---

9 Other cases which have excluded evidence resulting from a joint search at a federal prosecution while recognizing the search as being constitutionally proper include *United States v. Pechac,* D.C., 54 F.R.D. 187 (1972) *United States v. Brougher,* D.C. Pa., 19 F.R.D. 79 (1956) *United States v. Elliott,* D.C. Mass., 210 F. Supp. 357 (1962).

10 The federal return failed to list all of the drugs seized; however, the state warrant did contain such a list. Thus, the dual purpose of S. C. Code § 17-271 and Federal Rule 41, record keeping and notification to the accused, was fulfilled. At any rate errors in a return, absent prejudice to the accused, should not involve the exclusionary rule. It should be used only as a remedial device to guarantee constitutional rights. *United States v. Calandra,* 414 U. S. 338, 94 S. Ct. 613, 38 L. Ed. (2d) 561 (1974). Furthermore, we prefer the view of Sellers and *Harrington, supra,* when dealing with statutory violations of this type.

issued by a magistrate or a ministerial recorder, neither of whom is required to have been exposed to rigid, formalized legal training. There may be a time when federal procedures would fall short of procedures we would adopt prudentially. This is not such a case.[11]

Furthermore, any invasion of privacy was inevitable since the federal agents were vested with search authority. On this basis alone some courts would not apply the exclusionary rule and with good reason. *United States v. Ragsdale*, 470 F. (2d) 24 (5th Cir. 1972). The exclusionary rule is harsh medicine. The jury is charged with the duty of searching for the truth to determine the innocence or guilt of the accused, within the appropriate legal standard. Denial of probative evidence detracts from that search. Exclusion should be applied only where deterrence is clearly subserved.[12]

Finally, *Mapp* and its progeny are designed to encourage rather than discourage healthy federal-state relations. In this day the business of ferreting out crime, particularly international in scope, often requires cooperation between federal and state authorities. We should not cast a halting blow to that cooperation.

For the above stated reasons, we conclude the trial judge properly admitted the evidence resulting from the search of the Pendleton Street residence.[13]

---

[11] The federal return failed to list all of the drugs seized; however, the state warrant did contain such a list. Thus, the dual purpose of S. C. Code § 17-271 and Federal Rule 41, record keeping and notification to the accused, was fulfilled. At any rate errors in a return, absent prejudice to the accused, should not involve the exclusionary rule. It should be used only as a remedial device to guarantee constitutional rights. *United States v. Calandra*, 414 U. S. 338, 94 S. Ct. 613, 38 L. Ed. (2d) 561 (1974). Furthermore, we prefer the view of *Sellers and Harrington, supra,* when dealing with statutory violations of this type.

[12] The ends of justice are unquestionably served by an expeditious revelation of the truth, assuming that the means used to reveal the truth do not encroach on fundamental constitutional rights.

[13] At trial the only objection to the federal warrant was that it was not relevant. This objection was overruled and the federal warrant and supporting affidavit were introduced into evidence. Appellant did not challenge this decision on appeal; however, as stated earlier,

Appellant next objects to testimony that Miss Sachs accompanied the officers to the federal courthouse, typed the affidavits for the search warrants, and delivered the package. This basis for this testimony was personal observation. No conversations between the officers and Miss Sachs were related. Yet the appellant asserts that this is objectionable hearsay or implications from hearsay citing *State v. Corn,* 215 S. C. 166, 54 S. E. (2d) 559 (1949). In *Corn* a witness testified that after firing several shots in the air, he questioned persons in the area but was unable to find anyone who heard a shot. It indirectly had the effect of evoking a response from each person contacted: "No, I didn't hear a shot." Appellant has not been the victim of any such artifice.

This evidence was further objected to on the grounds of *res inter alios acta* "things done between strangers ought not to injure those who are not parties to them." Black's Law Dictionary (4th Ed.) p. 1471. Rele-

---

we sought supplemental briefs on the question of whether the federal warrants could support the search.

In the supplemental brief appellant has made additional challenges to the federal warrant. These are not properly before us. In *Roche v. South Carolina Alcoholic Beverage Control Commission* decided, S. C., 211 S. E. (2d) 243, 1975, quoting *Powers v. City of Aiken,* 255 S. C. 115, 117, 177 S. E. (2d) 370, 371 (1970), we stated that the purpose of appeal is "to determine if the lower court did something that it should not have done, or omitted doing something it should have done." Thus, the appeal must deal with matters presented to the trial judge.

Furthermore, the objection to the warrant now asserted by appellant, that probable cause cannot exist when delivery is to be in futuro is not supported by the cases. The federal warrant required delivery to the appellant, not merely to a place, and the warrant was not to be executed until delivery had been accomplished. *United States v. Odland,* 502 F. (2d) 148 (7th Cir. 1974); *United States ex rel. Beal v. Skaff,* 418 F. (2d) 430 (7th Cir. 1969); *People v. Glen,* 30 N. Y. (2d) 252, 331 N. Y. S. (2d) 656, 282 N. E. (2d) 614 (1972); *United States v. Feldman,* 366 F. Supp. 356 (1973); *United States v. Coughlin,* D. C. Mich., 338 F. Supp. 1328 (1972); see *United States v Galvez,* 465 F. (2d) 681 (10th Cir. 1972); *Chapman v. United States,* 443 F. (2d) 917 (10th Cir. 1971). Nor does appellant distinguish Miss Sachs' delivery from *Lopez v. United States,* 373 U. S. 427, 83 S. Ct. 1381, 10 L. Ed. (2d) 462 (1963); *Lewis v. United States,* 385 U. S. 206, 87 S. Ct. 424, 17 L. Ed. (2d) 312 (1966); *Hoffa v. United States,* 385 U. S. 293, 87 S. Ct. 408, 17 L Ed. (2d) 374 (1966).

vancy is at the core of that doctrine. We fail to see how the assaulted testimony falls within that principle.

Coupled with these arguments is a denial of the right of confrontation. Since the officers testified only to what they saw, we fail to see how the appellant was denied the right to confrontation. Furthermore, it too was not raised at trial and is not properly submitted on appeal.

Appellant also contends that the manner of introduction of evidence was impermissibly prejudicial and that the evidence fails to prove his possession of the controlled substances. Further recitation of the facts of the search and of the trial are necessary to understand this argument. At the time of the search several persons in addition to Sachs and Mr. and Mrs. Chandler were present or had been present during the preceding thirty minutes. The house was a two story structure, with two upstairs bedrooms and bathrooms. When the officers entered, they heard shuffling of feet upstairs. Within seconds they apprehended Sachs in one bathroom, attempting to flush capsules and paraphernalia down the commode. Over two hundred capsules were recovered from the bowl of the commode and were introduced at trial. No controlled substances were found in these capsules. Pills were scattered about the bathroom floor leading to a closet. These along with drugs found in the appellant's bedroom, the Chandler's bedroom and the downstairs area were introduced at trial. Prescription drugs as well as nonprescription ones (including aspirin) were introduced.[14] The State offered twenty-seven exhibits, seven of which were marked as "glass vial with capsules."

Officers testified to the location of the contents of each vial by a letter designation of the vial. Later Mrs. Kay Dryman, a chemist who performed the analysis of the substances at the SLED laboratory, testified as to the contents themselves by exhibit number and by a designation she had

---

[14] The trial judge directed a verdict as to a count of possession of a prescription drug.

placed on the vials. Although the jury could observe the exhibits, there was no testimony correlating the identification letter used by the officers and the exhibits number used by Mrs. Dryman. Some exhibits contained controlled substances; others did not. Furthermore, the pills had been placed in the vials by the officers. Lieutenant Dennis testified that contents of each vial were found in various places. Contents of specific vials were found "all over the house", "in one of the two bedrooms and the hallway" and "in the bedroom area and hallway." Because of the various places where the drugs were found and that some were not illegal, it was of crucial importance for the jury to correctly correlate the testimony of the officers with that of Mrs. Dryman.

Enforcement of our laws regulating possession of controlled substances has become a serious problem however, this does not relieve The State of the burden of proving either actual or constructive possession of the substances charged in the indictment. *State v. Ellis,* 263 S. C. 12, 207 S. E. (2d) 408 (1974); *State v. Tabory,* 260 S. C. 355, 196 S. E. (2d) 111 (1973). This is a close case because attempted destruction of evidence is regarded as an incriminating circumstance. *State v. Epes,* 209 S. C. 246, 39 S. E. (2d) 769 (1946); Wharton's Criminal Evidence (13th Ed.) Vol. 1, § 216, p. 463. Under the circumstances of this case, an inference might arise as to pills in the immediate bathroom area, but it could not include pills found in the Chandler's bedroom or other areas of the house. Perhaps the jury by viewing the exhibits could correlate the testimony of the officers and Mrs. Dryman; however, the likelihood of prejudice is so great that the conviction of possession of a barbiturate and amphetamines must be reversed and remanded.[15]

---

[15] The record on appeal, as agreed to by The State, does not contain the exhibits. After carefully charting the testimony concerning the location of various pills and the chemical identification, we are unable to determine which, if any, of the barbiturates and amphetamines the defendant had in his possession.

The conviction of the hashish charge is not infected with any such prejudice. More than two pounds of hashish were contained in two boxes, located in the appellant's bedroom. There is no likelihood of confusion with the smaller vials. Additionally, there was testimony that appellant knew the contents of the package and that the package was controlled by him. Therefore, the question of possession of hashish was properly submitted to the jury.

Appellant's final contention is that he has been denied his Sixth Amendment right to know the nature of the charges against him, as well as his statutory right pursuant to § 17-402 of the Code. This is based on the fact that he was charged with possession of hashish, whereas, under the applicable section of the Code 32-1510, marijuana but not hashish is listed as a controlled substance. Mrs. Dryman testified that hashish is made from the marijuana plant by a very simple extraction of tetrahydra cannabis, the hallucinogenic substance present in marijuana. She further testified that hashish was ten times as potent as marijuana because it does not contain stem and leafy material of the plant. Therefore, appellant's position is patently without merit. The Sixth Amendment requirement is not to be applied in a hypertechnical, artificial manner, *Parker v. Levy,* 417 U. S. 733, 94 S. Ct. 2547, 41 L. Ed. (2d) 439 (1974); *Smith v. Goguen,* 415 U. S. 566, 94 S. Ct. 1242, 1247, 39 L. Ed. (2d) 605 (1974). Similarly, the statutory right by its very language is intended to make the charges easily understood.

The trial judge sentenced appellant to five years imprisonment and a Five Thousand ($5,000.00) Dollar fine for the hashish offense. Separate concurrent sentences were imposed for the other convictions. Accordingly, the trial court sentence for possession with intent to distribute hashish is hereby affirmed.

Affrmed in part, reversed in part.

Moss, C. J., and Lewis and Littlejohn, JJ., concur.

Bussey, J., concurring and dissenting.

Bussey, Justice (concurring and dissenting) :

The majority opinion correctly concludes, *inter alia,* that the physical evidence was seized pursuant to the Federal search warrant, the validity of which was not challenged, and that therefore, the exclusionary rule does not apply. Such being the case, the validity or invalidity of the State search warrant becomes, in my view and for the purpose of this appeal, totally immaterial. The majority opinion unnecessarily, and at great pains, I submit, undertakes to sustain the validity of the State search warrant which, to say the least, is of questionable validity.

As I have heretofore had the occasion to urge upon my bretheren, if the experience of the ages should have taught us, as appellate jurists, any truly important lessons, possibly the most important one of all might well be that we should maintain a constant vigil to avoid wading in troubled and tumultuous waters when doing so is totally unnecessary to the decision of the cause before us. Since in my view we do not need at all to reach the issue of the validity or invalidity of the State warrant I venture most timorously into troubled waters, along with my brethren, but only to the limited extent of considering two quite important points which, as treated by my brethren, I submit are provocative of extreme difficulty in the future.

The majority opinion reaches the conclusion, by virtue of code section 30-203, that the City of Columbia, under Act No. 161 of the Acts and Joint Resolutions (1965), had the power to appoint multiple ministerial recorders. To say the very least, such a holding is highly suspect, of doubtful soundness and one that should be avoided because of its effect in lulling municipalities into a false sense of security as to the power to appoint an unlimited number of ministerial recorders, inviting ultimately the appointment of some who could not meet the constitutional requirement of neutrality. Act No. 161 of the Acts of 1965 is entitled "An

Act To Provide For The Establishment Of *The Office Of Ministerial Recorder* In Certain Municipalities * * *." Section 1 of said Act provides that,

"The mayor and council of any municipality having a recorder's court may establish *the office of ministerial recorder* and *elect a ministerial recorder* who shall hold office at the pleasure of the council. The salary of *the ministerial recorder* shall be fixed by the mayor and councilmen of such municipality. Before entering upon the discharge of the duties of the office of ministerial recorder, *the person elected* shall take and prescribe to the usual oath of office." (Emphasis added).

As desirable as it might be for the City of Columbia to have more than one ministerial recorder, I see nothing in the language of the Act to authorize more than one such recorder.

Of course, code section 30-203 does provide, *inter alia,* that "The words 'person' and 'party' and any other word importing the singular number used in any act or joint resolution shall be held to include the plural . . ." But, such is applicable only in "cases in which the *spirit and intent of the act or joint resolution may require it.*" (Emphasis added). I fail to observe anything whatever in Act No. 161 which would indicate that either the spirit or intent thereof required that the singular language used therein be construed as intending or including the plural. Stated otherwise, I see nothing in section 30-203 which would have the effect of changing the plain language of the 1965 Act.

What is particularly regrettable to me is the treatment accorded by the majority opinion to the decision of this Court in *State v. York,* 250 S. C. 30, 156 S. E. (2d) 326 (1967), the clear holding of that case being treated in the majority opinion here as mere dicta. There was only one cardinal issue decided in *State v. York,* to wit: that the trial judge erred in failing to exclude evidence which was

seized pursuant to a search warrant issued upon a statutorily defective affidavit. The opinion in *York* of course, discusses various contentions of the State as to the validity of the search, but there can be no question of the fact that the court held the affidavit to be defective, the warrant invalid and that the evidence should have been excluded.

In *State v. Williams,* S. C., 203 S. E. (2d) 436 (1974), without objection, evidence was offered to the effect that the magistrate issuing the search warrant had before him sworn oral testimony in addition to the content of the affidavit, and the question not having been preserved below, this Court did not pass on whether the magistrate in considering the issue of probable cause for the issuance of a warrant could, or not, consider additional oral testimony concurrently offered at the time of the execution of the affidavit.

The majority opinion as written, I respectfully submit, does violence to the holding of this Court in *State v. York* and to the statute upon which *York* was predicated. Just where this leads us with respect to future cases is indeed most difficult to predict. I most respectfully suggest that the foregoing, relatively brief criticisms of the majority opinion, should convince my brethren that much thereof is totally unnecessary to the decision of this case and should be deleted because it creates more problems and solves none.