524 S.E.2d 394

**The STATE, Petitioner,**

v.

**Victor Wyatt MISSOURI, Respondent.**

**No. 25031.**

Supreme Court of South Carolina.

Heard June 9, 1999.

Decided Dec. 6, 1999.

Attorney General Charles M. Condon, Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Salley W. Elliott, Senior Assistant Attorney General Norman Mark Rapoport, all of Columbia; and Solicitor Robert M. Ariail of Greenville, for petitioner.

Chief Attorney Daniel T. Stacey, of South Carolina Office of Appellate Defense, of Columbia, for respondent.

TOAL, Justice:

In this criminal case, this Court granted certiorari to review the Court of Appeals' unpublished opinion in *State v. Missouri*, 97–UP–448 (Ct.App.1997). We affirm.

### FACTUAL/PROCEDURAL BACKGROUND

During January and February 1995, Greenville detectives were investigating a crack cocaine ring with the help of a confidential informant. On February 3, 1995, the police obtained a search warrant to search the home of Laura and Curtis Sibert a/k/a "Hot Sauce" for cocaine. The lead detective, Eric Cureton, submitted an affidavit in support of the search warrant. The affidavit states, in part:

Your affiant [Eric Cureton] states that on January 25, 1995 he received information from investigator Sam C. Cureton of the Greenville County Sheriff's Office pertaining to Victor Wyatt Missouri. The information that was relayed to your affiant that Missouri was involved in the manufacture and distribution of crack cocaine. The following is a chronological chain of events leading to your affiants [sic] belief that Victor Wyatt Missouri, and others not yet identified, are manufacturing and distributing crack cocaine. . . .

The confidential source of information, who from here forward will be referred to as CSI, stated that for the past two months he has purchased a total of two kilograms of cocaine

from Victor Missouri. He would receive this in half kilo quantities every two weeks.

On January 31, 1995 CSI stated that he had talked with Missouri and another subject who is only known as "Hot Sauce." During this conversation Missouri and "Hot Sauce" stated that they were going to Atlanta, Georgia on February 1, 1995 and obtain four kilos of powder cocaine. This cocaine would then be delivered to Greenville, South Carolina and cooked into crack cocaine. On February 1, 1995 this same CSI went by "Hot Sauce's" apartment at 400 Summit Drive apartment 5–D, Summit Place Apartments. During a conversation with "Hot Sauce" CSI was told that he had not been able to leave for the trip to Atlanta, that they had some things to get together beforehand. During this same conversation CSI told "Hot Sauce" the he wanted to purchase from him a half of a kilo. "Hot Sauce" told CSI that it would cost him around $13,000.00 for the half kilo. CSI told "Hot Sauce" to call him when he left for Atlanta.

On February 2, 1995 at 4:00 in the afternoon, CSI went to Missouri's residence at 126 Sycamore Drive in the City of Greenville, South Carolina. At the residence was Missouri and "Hot Sauce." "Hot Sauce" told CSI that he was leaving for Atlanta around 4:30 and would return around midnight that same night. "Hot Sauce" told CSI that he would page him as soon as he got back in town.

On February 3, 1995, at 4:00 in the morning, Missouri called CSI and told him that "Hot Sauce" was back and they needed somewhere to cook the crack. He said he couldn't cook it at his (Missouri) house because he had relatives there. CSI told him he would give him an answer later and he ultimately told him no. Around 9:00 this same morning CSI paged "Hot Sauce" via his digital pager. "Hot Sauce" returned the call and told CSI they were still trying to get it together. At 10:15 another page was made to "Hot Sauce" with the same results. At 2:00 in the afternoon the CSI drove to "Hot Sauce's" apartment at 400 Summit Drive and went in to inquire about his portion of the cocaine. Your affiant wired the CSI with a body transmitter that would enable your affiant to monitor the conversations he had while inside this apartment. Your affiant, while monitoring the audio transmitter, heard a male voice, whom CSI later

stated was "Hot Sauce", question CSI about the phone that had been used earlier trying to set the transaction up. This male appeared to be somewhat reserved about talking with CSI about the cocaine. CSI told your affiant that "Hot Sauce" did appear to be nervous about the deal they were trying to make. **"Hot Sauce" told CSI that he had the crack but he would call him when it was right.**

While officers of the Vice and Narcotics Bureau were surveilling 400 Summit Drive, Apartment 5–D on February 3, 1995, it was determined that Missouri, "Hot Sauce" and others who have not been identified, were in the apartment. Around 5:00 a black male and black female left the apartment in a white dodge van.... The van then traveled to Parkersway Foods at Worley Road and Rutherford Road. The female again went inside. After the female left Detective Sergeant T.D. Christy interviewed the clerk and he stated that the black female had purchased 5 boxes of Arm & Hammer baking soda. The van then traveled back to apartment 5–D and the female took a grocery bag into the apartment. She returned to the van and they left again. The surveillance on the van was terminated at this time. Your affiant, through training, experience and working with other experienced investigators, believes that Victor Wyatt Missouri, "Hot Sauce" and others yet unknown are manufacturing crack cocaine inside of apartment 5–D Summit Place Apartments, 400 Summit Drive in the City of Greenville, South Carolina.

When the police executed the search warrant, officers found Missouri in the kitchen standing over a sink, facing a set of triple beam scales. Inside the sink was a quantity of cooked, crack cocaine. Missouri was arrested for trafficking in crack cocaine. At his trial, Missouri moved to suppress the evidence obtained in the search. Missouri argued the affidavit supporting the search warrant contained false information and further omitted critical, exculpatory information. The trial court denied the motion to suppress. In an unpublished opinion, the Court of Appeals reversed the trial court, holding that the omitted information was necessary for the magistrate's finding of probable cause. *See State v. Missouri*, 97–UP–448 (Ct.App. 1997). Judge Hearn dissented in a separate opinion. This Court granted certiorari to address the following issue:

Did the Court of Appeals err in applying the test articulated by *Franks v. Delaware*[1] for considering a challenge to the veracity of a search warrant affidavit?

## LAW/ANALYSIS

The State argues that the Court of Appeals improperly applied the *Franks* test in deciding whether the magistrate had probable cause to issue the search warrant. We disagree.

At the suppression hearing, Officer Cureton testified that the following sentence in the warrant affidavit was in fact a false statement: " 'Hot Sauce' told CSI that he had the crack but he would call him when it was right." Officer Cureton stated that Curtis Sibert a/k/a "Hot Sauce" never told his informant there was crack in Hot Sauce's apartment. Further on cross-examination, Officer Cureton testified that his informant had gone into Hot Sauce's house at about 3:00 p.m. on February 3, and the informant was told that Missouri had the "stuff," but it was not there. The informant then left the residence and returned at about 4:00 p.m. after Missouri had returned to the house. A "wire" had been placed on the informant's body to enable the police to listen to the conversations. After the informant left Hot Sauce's house, he approached Officer Cureton and told him, "It's not there. It's not there." In addition, Hot Sauce had earlier told the informant that he did not want to cook the cocaine at his house because his wife was trying to go straight. This information was not provided to the magistrate in the supporting affidavit. The trial judge concluded that even with this information, the magistrate would have had a substantial basis upon which to find probable cause for issuing the warrant.

In *Franks v. Delaware*, the United States Supreme Court held that the Fourth and Fourteenth Amendments gave a defendant the right in certain circumstances to challenge the veracity of a warrant affidavit after the warrant had been issued and executed.[2] To summarize, the Court provided the following two-part test:

---

1. 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

2. In *State v. Sachs*, 264 S.C. 541, 216 S.E.2d 501 (1975), this Court also addressed whether a defendant could attack the veracity of facts sup-

(1) To mandate an evidentiary hearing, the challengers' attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof; and

(2) If these requirements are met, and if, when material that is subject of the alleged falsity or recklessness disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required.

*Franks*, 438 U.S. at 171–72, 98 S.Ct. at 2684, 57 L.Ed.2d at 682.

 *Franks* addressed an act of *commission* in which false information had been included in the warrant affidavit. However, the *Franks* test also applies to acts of *omission* in which exculpatory material is left out of the affidavit. *See, e.g., United States v. Colkley*, 899 F.2d 297 (4th Cir.1990); *United States v. Vazquez*, 605 F.2d 1269 (2d Cir.1979). To be entitled to a *Franks* hearing for an alleged omission, the challenger must make a preliminary showing that the information in question was omitted with the intent to make, or in reckless disregard of whether it made, the affidavit misleading to the issuing judge.[3] There will be no *Franks* violation if the affidavit, including the omitted data, still contains sufficient information to establish probable cause. *See Colkley, supra.*

---

porting a search warrant when the warrant was valid on its face. Noting that the United States Supreme Court had not yet squarely addressed this issue, this Court answered the question in the affirmative, providing the following limited test: "Did the officer, or other government official, in such capacity, intentionally, recklessly, or in bad faith recite facts he knew or should have known to be erroneous, without correcting the error by additional affidavit or affirmation, to obtain the issuance of a warrant?" *Sachs*, 264 S.C. at 555, 216 S.E.2d at 509. The Court further provided the following caveat: "However, even if the officer was delict, so long as probable cause was established by affidavit or affirmation without the aid of the erroneous fact, the warrant satisfies the constitutional demands." *Id.*

**3.** *See* Edward Gregory Mascolo, *Controverting An Informant's Factual Basis for a Search Warrant: Franks v. Delaware Revisited and Rejected Under Connecticut Law*, 15 Q.L.R. 65 (1995).

■ The instant case involves both an act of commission and an act of omission by Officer Cureton in drafting the warrant affidavit. We find that Officer Cureton at least acted recklessly in making the false statement and in omitting the exculpatory information. He testified unequivocally that the statement was false, and his informant had, in fact, made a statement to the contrary. Thus, the primary issue before this Court is whether excluding the false information and inserting the exculpatory statement, there remains a substantial basis upon which the magistrate could have found probable cause to issue the warrant. In doing so, this Court must apply the "totality of the circumstances" test of *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). *See Colkley, supra.*

The supporting affidavit begins with the allegation that Victor Missouri and others "are manufacturing and distributing crack cocaine." The affidavit then discusses a series of chronological events which are intended to support this prefatory allegation. The affidavit's description of the informant's contact with the suspects on the day the search warrant was obtained culminates with the false statement that Hot Sauce told the informant he had the crack but would call him when it was right. If our task were simply to consider the affidavit without this statement, we would likely find a substantial basis for probable cause. The absence of the false statement makes the location of the drugs less certain, but this uncertainty is negated by the other events recounted in detail in the affidavit.

However, under *Franks*, our inquiry does not end here. We must also consider the effect of adding the informant's statement, "It's not there," as well as the information that Hot Sauce did not intend to cook the cocaine at his apartment. In doing so, we hold that the affidavit would not support a finding of probable cause to search Hot Sauce's apartment.

We begin with the presumption that the Fourth Amendment does not require an affiant to include all potentially exculpatory evidence in the affidavit. *See Colkley, supra.* A presumption to the contrary "would perforce result in perniciously prolix affidavits that would distract police officers from more important duties and render the magistrate's determina-

tion of probable cause unnecessarily burdensome." *Colkley*, 899 F.2d at 303. However, in the instant case, the omitted information goes to the very heart of the affidavit's purpose, which is to establish probable cause to search Hot Sauce's apartment for crack cocaine. Instead of simply creating some uncertainty in the affidavit, the inclusion of the omitted information creates an affirmative hurdle which the remaining portions of the affidavit must overcome. These other portions reveal that the suspects had arranged to sell a quantity of crack cocaine to the confidential informant. The suspects purchased cocaine in Atlanta and transported it to Greenville for this purpose. The affidavit further reveals that the suspects purchased baking soda and brought it back to Hot Sauce's apartment. Baking soda is known to be a common cutting and drying agent when converting powdered cocaine into crack cocaine. Standing alone, these facts are not conclusive as to the presence of crack cocaine in Hot Sauce's apartment, but they make it a fair probability. Yet, when the omitted information is inserted, the probable presence of the crack cocaine in the apartment is defeated. This, in turn, erodes the basis upon which a magistrate could find probable cause to search Hot Sauce's apartment. The remaining portions of the affidavit fail to rehabilitate this basis.[4]

We realize this case presents a close call on the probable cause determination. However, the combination of the police officer's deliberate falsehood and his omission of critical facts pollute the affidavit to the extent that a magistrate could not have found that probable cause existed to issue the search warrant. There is no doubt that the officer intended to mislead the magistrate in obtaining the search warrant. We realize that police officers routinely leave out facts they believe are immaterial to the probable cause determination.

---

4. The cases cited in Judge Hearn's dissent are inapposite to the instant case because they do not involve the reckless or intentional omission of material facts. Rather, these cases deal with the constitutionality of including in the search warrant affidavit reconnaissance information gathered from thermal imaging machines. In addressing this issue, the cases found that even without the thermal imaging information, there was sufficient information in the affidavits to support a finding of probable cause. *See United States v. Cusumano*, 83 F.3d 1247 (10th Cir.1996); *United States v. Robinson*, 62 F.3d 1325 (11th Cir.1995); *United States v. Ishmael*, 48 F.3d 850 (5th Cir.1995).

Yet, when an omission is combined with an affirmative false-hood, it reveals that the affiant not only believed the omitted information was critical, but that a statement in the affidavit to the contrary was necessary for establishing probable cause. We recognize that under *Franks* our role is not to punish dishonest police officers but, rather, to ensure that a substantial basis exists to find probable cause. That said, the depth of the prevarication perpetrated by the officer in this case undermines any remaining legitimacy the affidavit might possess. Under these circumstances, this Court is required by the Constitution to invalidate the search warrant where the facts create such a close call on the probable cause determination.

## CONCLUSION

Based on the foregoing, we **AFFIRM** the Court of Appeals.

MOORE, J., concurs.

FINNEY, C.J., concurs in result only.

BURNETT and WALLER, JJ., dissenting in a separate opinion.

BURNETT, Justice (dissenting):

I respectfully dissent. Although Officer Cureton's conduct is reprehensible, the issue is whether probable cause existed in spite of the investigator's inclusion of a false statement and omission of exculpatory information from the supporting affidavit.[1] In my opinion, probable cause remained in spite of the officer's misrepresentations.[2]

---

1. *See Franks v. Delaware,* 438 U.S. 154, 171–72, 98 S.Ct. 2674, 2684, 57 L.Ed.2d 667, 682 (1978) (1) where defendant establishes deliberate falsehood or reckless disregard for the truth and those allegations are accompanied by offer of proof and 2) if these requirements are met, and if, when material that is subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required).

2. In my opinion, respondent did not have standing to challenge the sufficiency of the search warrant as he had no expectation of privacy in his co-defendant's apartment. *Rawlings v. Kentucky,* 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980).

In *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527, 548 (1983), the United States Supreme Court adopted the "totality of the circumstances" test for probable cause determinations:

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

See *State v. Bellamy*, 336 S.C. 140, 519 S.E.2d 347 (1999).

" 'In dealing with probable cause ... as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act'." *State v. Dupree*, 319 S.C. 454, 458, 462 S.E.2d 279, 282 (1995), *quoting Brinegar v. United States*, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879, 1890 (1949).

Here, Officer Cureton included the following false statement in his affidavit: " 'Hot Sauce' told [the informant] that he had the crack but he would call him when it was right." The majority concludes that, disregarding this false statement, there still existed a substantial basis from which to find probable cause. I agree.

In addition, Officer Cureton failed to inform the magistrate of certain exculpatory information. First, he did not tell the magistrate that when the informant first returned from Hot Sauce's apartment on February 3, the informant stated he was told respondent had the "stuff," but it was not there. Furthermore, the investigator failed to tell the magistrate respondent subsequently entered Hot Sauce's apartment. As a result, while wearing a wire, the informant again entered Hot Sauce's apartment and, upon return, stated, "It's not there. It's not there." Finally, the investigator did not advise the magistrate Hot Sauce had earlier told the informant he did not want to cook the cocaine at his apartment because his wife was

trying to "go straight." The majority concludes if Officer Cureton had included the omitted information in the supporting affidavit, probable cause to search Hot Sauce's apartment would not have existed. I disagree with this conclusion.

Considering the totality of the circumstances as reflected in the supporting affidavit, minus the false statement, and with the addition of the exculpatory information, there remains a substantial basis from which to find probable cause. The totality of the circumstances indicate Hot Sauce and respondent planned to go to Atlanta and obtain cocaine which they would then cook into crack cocaine in Greenville. The informant wanted to purchase cocaine in the same quantity as he had purchased it from respondent every two weeks for the past two months.

Three days later, respondent called the informant and said Hot Sauce had returned and they were looking for a location to cook the cocaine. The informant paged Hot Sauce twice the same morning. Hot Sauce returned the pages and told the informant he was continuing to look for a location to cook the cocaine. In the afternoon, the informant entered Hot Sauce's apartment. Hot Sauce suddenly appeared nervous and unwilling to discuss the drug buy. Hot Sauce indicated respondent, who was not present, had the cocaine and stated he did not want to cook the cocaine at his apartment because his wife was trying to "go straight."

After the informant left, respondent arrived at Hot Sauce's apartment. Two other individuals left Hot Sauce's apartment, purchased large quantities of baking soda, which is known to be used to process powder cocaine into crack cocaine, and returned to Hot Sauce's apartment with the baking soda.[3]

These circumstances provide a fair probability that contraband or other evidence of a crime could be found at Hot

---

**3.** I note Officer Cureton's testimony indicates the informant entered Hot Sauce's apartment twice on the afternoon of February 3, 1995, while the supporting affidavit states the informant entered the apartment only once. However, the important portion of the testimony and affidavit, that the informant last informed Officer Cureton the drugs were not in Hot Sauce's apartment, is contained in both.

Sauce's apartment at the time the search warrant was issued. Even assuming the informant unequivocally knew the drugs were not present in Hot Sauce's apartment, i.e., either because Hot Sauce had become suspicious and, hence, told the informant the drugs were not there or because respondent did not enter the apartment after the informant left, there was still probable cause to believe evidence of a crime could be found in the apartment. A warrant need not be based on the probability of discovering an illegal item on the premise to be searched.[4] Although common household items like baking soda are not incriminating, the purchase of a large quantity of baking soda by individuals associated with a recent drug purchase and looking for a location to cook cocaine is evidence of a crime. While officers may ultimately choose to wait until contraband is on the premise before obtaining a search warrant, knowledge the illegal substance is not on the premises does not automatically negate a finding of probable cause.

In my opinion, the trial judge properly ruled the evidence seized as a result of the search warrant should not be suppressed. *State v. Asbury*, 328 S.C. 187, 493 S.E.2d 349 (1997) (in criminal cases, appellate courts are bound by fact findings in response to preliminary motions where there has been conflicting testimony or where the findings are supported by the evidence and not clearly wrong or controlled by an error of law). I would reverse the decision of the Court of Appeals.

WALLER, J., concurs.

---

**4.** *Illinois v. Gates, supra* (probable cause exists when "there is a fair probability that *contraband or evidence of a crime* will be found in a particular place"); *see United States v. Gil*, 58 F.3d 1414, 1418 (9th Cir.1995) ("observations of conduct consistent with drug trafficking, even though apparently innocuous, can give rise to probable cause"); *United States v. Moody*, 977 F.2d 1425 (11th Cir.1992) (warrant authorizing search for envelopes, pieces of cardboard, paperclips, and string was unobjectionable for alleged crimes involving homemade bombs).