# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

The State, Respondent,

v.

James Monroe Brown, Appellant.

Appellate Case No. 2021-000469

———————

Appeal From Chesterfield County
Paul M. Burch, Circuit Court Judge

———————

Opinion No. 6143
Heard May 6, 2025 – Filed March 25, 2026

———————

**AFFIRMED**

———————

Chief Appellate Defender Wanda H. Carter and Former
Chief Appellate Defender Robert Michael Dudek, of
Columbia, for Appellant.

Attorney General Alan McCrory Wilson, Deputy
Attorney General Donald J. Zelenka, Senior Assistant
Deputy Attorney General Melody Jane Brown, and J.
Anthony Mabry, all of Columbia; and Solicitor William
Benjamin Rogers, Jr., of Bennettsville, all for
Respondent.

———————

**KONDUROS, J.:** James M. Brown appeals his conviction and sentence for
murder.  He argues the trial court erred in not suppressing evidence seized pursuant
to a search warrant obtained for his cell phone records.  He contends the search-
warrant affidavit was overbroad and vague.  He also asserts the affidavit contained

one specific allegation and the State stipulated that allegation was false. Additionally, he maintains the trial court erred in denying his motion for a directed verdict because no direct or substantial circumstantial evidence that he committed an overt act was presented to support the State's accomplice liability theory. We affirm.

## FACTS/PROCEDURAL HISTORY

James Henderson Jr. (Victim) lived in a mobile home park on Hillian-Edwards Road in Chesterfield County. His girlfriend, Moniquah Ingram (Girlfriend), and his two children also lived there. Victim had previously lived in the same mobile home park but in a different mobile home, which was next door to Shameika Ingram (Neighbor).

On January 21, 2017, Victim received a series of text messages and phone calls from multiple phone numbers. Some of those messages and calls were from his cousin, Kasean Smalls, who went by the nickname S.dot. Brenton Davis also sent Victim text messages appearing to ask him to come to Marlboro County, which Victim did not do. At 8:24 p.m., Smalls called Brown. Smalls sent a text message to Victim at 8:27 p.m. that stated, "Call me ASAP." Smalls called Victim one minute later. Davis called Victim at 8:29 p.m. Smalls called Victim again at 8:33 p.m. At 8:35 p.m., Victim called Smalls. Seconds later, Victim called Davis. Davis called Victim one minute later. At 8:37 p.m., Smalls sent Victim a text message containing only a phone number, which belonged to Brown. Victim called Smalls at 9:12 p.m., and Victim called Davis at 9:21 p.m.

Around 10:30 p.m. on January 21, Neighbor awoke when she heard a car door close and saw car headlights shining outside of her home. Neighbor thought relatives of her boyfriend, Thomas Lyle, were returning home and told him to let them into the home. Neighbor began hearing men outside her home calling for Victim by his nickname, S.B., and yelling for him to come outside. Lyle told Neighbor some of the men outside had guns. Lyle went outside to talk to the men, and Neighbor looked out the window and saw five men, several of whom were carrying guns, standing in her yard. She saw some of the men load firearms. The group of men believed Lyle was the person they were looking for but he eventually convinced him that he was not and showed the group the mobile home where Victim now lived. Some of the men got back in the car and others walked in front of the car while it drove to the mobile home where Victim had moved. A second car pulled around to the back of Victim's home but no one exited that car. The men in the first car all exited the car. Several but not all the men were carrying

firearms. One man in the group was screaming into his cell phone for Victim to come outside and "answer to him." Victim, Girlfriend, and his two young children were at the mobile home when the group arrived. Neighbor could see Victim standing in his bedroom window.

Victim received several phone calls in rapid succession[1] and after a phone conversation that lasted a few seconds, he went outside and approached the group of men. Shortly thereafter, shots were fired. Victim began running away into the woods and was chased by one person.

Officers responded to Victim's residence due to a report of shots fired. Girlfriend told authorities that Victim was missing. Officers saw bullet holes and shell casings in the area and began searching for Victim. Law enforcement "pinged" Victim's cell phone several times and eventually found his body.

On January 24, 2017, the Chesterfield County Sheriff's Office (the Sheriff's Office) obtained a search warrant for cell phone records from January 21 to 22, 2017, for a specific phone number. The application for the warrant sought "[d]irect connect detail(s), call detail(s), caller identification(s), and cellular site record(s)" for that specific phone number. Captain Wayne Jordan Jr., who at the time was a supervisory lieutenant in the detective unit of the Sheriff's Office, swore an affidavit to obtain the warrant. The affidavit stated, "That on January 21st, 2017[,] [Victim] was shot and killed at his home in Cheraw, South Carolina and during this incident he received several phone calls from the target number minutes before his murder. This is an ongoing Murder investigation."[2] Captain Jordan gave supplemental testimony to obtain the warrant; he testified he informed the magistrate that the phone number for which he sought the warrant was "associated with" sending numerous threats to Victim's phone number and was part of an

---

[1] Davis called Victim at 10:40, 10:42, and 10:43 p.m.

[2] The affidavit contained no other information specific to this crime or phone number. The affidavit contained several statements about the usefulness of cell phone records in criminal investigations. The affidavit explained "cell phone records . . . can link an offender to a crime scene or a particular location" and through the records, law enforcement would be able to determine the physical location of the individual using the phone number. The affidavit also noted the phone records, in addition containing the records of calls made, "may provide evidence of the crimes being investigated or leads into the identities of the perpetrators" because "[c]ell phones are commonly used for email, text messaging, video, and photos."

ongoing murder investigation.  The records obtained from Verizon as a result of the search warrant identified Brown as the owner of the cell phone number.

Brown, Jamarcus Sellers, Davis, and others were arrested and charged with Victim's murder.[3]  A grand jury indicted Brown for murder.

At the start of Brown's trial, the trial court held a hearing on Brown's motion to suppress his cell phone records the Sheriff's Office obtained by search warrant. Brown argued the warrant was vague and overbroad and lacked probable cause. Captain Jordan provided the only testimony at the suppression hearing.  Captain Jordan testified he had appeared before a magistrate to obtain search warrants for cell phone records for several phone numbers that were on Victim's phone. Captain Jordan testified he supplemented his affidavit with testimony in front of the magistrate.  He stated he told the magistrate, "[T]his number was also associated with . . . [V]ictim's phone as far as numerous threats and it was part of an ongoing murder investigation."  At the suppression hearing, he testified that to the best of his recollection, Brown's number showed up on Victim's phone.  On cross-examination, Captain Jordan indicated he learned of Brown's phone number during the investigation through the collection of witnesses' statements.  He was unable to identify which officer had obtained the number or which witness provided the number.  He then stated the number came from Victim's phone. When asked if he had later learned that Brown's phone number never called Victim's phone number, Captain Jordan answered that he did not know if that was true or not.  He also did not know whether Brown's phone number had sent a text message to Victim's phone number.  Captain Jordan also could not answer whether Brown's phone number was saved in Victim's phone, because he said Victim's phone was never recovered, despite testifying earlier in the hearing that Victim's phone had been recovered.  He subsequently testified he did not know if Victim's phone was recovered or not.[4]

On redirect examination, the State stipulated that "we do not have any phone calls being made between . . . [V]ictim's phone number and to [Brown]'s phone."  The State asked Captain Jordan to look at a phone extraction report for Victim's phone number.  Captain Jordan testified the report indicated that Victim received and read a text message on January 21, 2017, at 8:37 p.m. from Smalls that provided Brown's phone number.  On recross-examination, Brown asked Captain Jordan,

---

[3] Davis pled guilty to manslaughter.  Sellers died sometime after Victim's murder.

[4] During trial, another officer with the Sheriff's Office testified law enforcement recovered Victim's phone and he analyzed the data on it.

"[W]e know that [Brown's] phone never called [V]ictim's phone; right?"  The State again stipulated, "The defendant's phone never actually called . . . [V]ictim's phone."  Captain Jordan answered, "Not without me going through all this, I mean, I don't know."  Brown asked, "[W]e can stipulate that defendant's phone never text[ed] . . . [V]ictim's phone?" and Captain Jordan answered, "I guess so, yes."  Brown then asked, "So what we have is someone else texting . . . [Brown's] phone number to . . . [V]ictim; correct?"  Captain Jordan responded, "That's part of it, yes.  Like I said, during the investigation, we had folks giving us information, giving us names."  Brown next asked, "And that was not -- but that information was not on the search warrant; correct?" and Captain Jordan replied, "No, sir."  On redirect after recross-examination, Captain Jordan testified the cell phone location data received from Brown's and Davis's phone records showed both their phones in the vicinity of Hillian-Edwards Road during the requested time period.

At the close of the suppression hearing, the trial court found the evidence was admissible, stating, "I don't see any problem with the warrant."

At trial, Neighbor identified Brown as one of the men outside her home who had later approached Victim's home.  She testified Brown had been six feet from her window.[5]  She indicated that some of the men had guns, which she saw them loading, but she did not see Brown with a gun at any point.  Neighbor also identified Davis and Sellers as being two of the men she saw in her yard.  Neighbor testified she saw Brown and some of the other men get back in the car and drive to Victim's new home.  She explained that the other men walked in front of the car during the short drive.  She stated that the men in the car, including Brown, all exited the car at Victim's new home.  Neighbor testified that as the group stood in Victim's yard, she began hearing and seeing gunfire and saw Victim running while being chased.  Neighbor confirmed that Brown was "an active participant" in what was happening even though she did not see him with a gun.

Girlfriend testified that on the night Victim was shot, "[h]e was concerned, worried[,] and in disbelief."  She provided that Victim told her "they want to put me in the box."  Girlfriend testified she thought Victim meant he would be in the middle of a group and have to fight multiple men at one time.  She testified that shortly before exiting the home, Victim hugged his children and told them he loved them.  Once Victim went outside, Girlfriend saw him talking to one man with a

---

[5] Brown challenged Neighbor's identification of him.  Following a hearing pursuant to *Neil v. Biggers*, 409 U.S. 188 (1972), the trial court allowed the identification.

vehicle's headlights shining on them, while several other men stood around. She identified the man Victim spoke to as "Bliz"[6] but could not identify any of the other men. Girlfriend testified she stopped looking outside because she went to check on the children and then heard gunshots and ducked. She then went outside to look for Victim, and two men asked her where Victim was. She went back inside, and law enforcement arrived shortly thereafter. She testified she could not see or hear what took place just before the gunshots began.

Dr. Janet Ross, a pathologist, testified Victim was shot four times, all on the back side of his body, with one of those shots being fatal. Suzanne Cromer with the South Carolina State Law Enforcement Division (SLED) testified that based on the ammunition collected from the crime scene and Victim's body, three to four different weapons had been fired at the scene.

First Sergeant Graig Burns with the Sheriff's Office testified he responded to the crime scene and helped in the search for Victim. He provided that while he was searching the woods for Victim, he overheard men talking. He explained that because of what he overheard, he searched for information about three people's names, which led him to Marlboro County. He indicated the people he investigated as a result were Brown, Sellers, and Davis. He testified that law enforcement located Brown's car in Davis's back yard. First Sergeant Burns testified that when he interviewed Brown, Brown denied being in Chesterfield County on the evening of the murder.

First Sergeant Burns testified he performed an extraction on Victim's cell phone, which is a process that downloads photos, phone numbers, phone call logs, and text messages. He stated he reviewed the cell phone records of Davis, Brown, and Victim to see the communication between them. He testified Brown claimed to have lost his phone on the day of Victim's murder but law enforcement determined that was untrue.

First Sergeant Burns testified Davis sent a text message to Victim on January 21, the day of the murder, at 5:34 p.m. that stated, "Yo, you couldn't make it?" At 8:02 p.m. Davis texted Victim, "Yo, bro, you need to get here." At 8:24 p.m. Smalls—Victim's cousin—called Brown. At 8:27 p.m., Smalls texted Victim, "Call me ASAP." At 8:37 p.m., Smalls texted Victim just a phone number, which First Sergeant Burns provided belonged to Brown. First Sergeant Burns testified the

---

[6] Later testimony from an officer with the Sheriff's Office indicated Davis used the nickname Bliz.

cell phone records demonstrated Davis and Brown called each other multiple times in the early morning hours on the day of the murder, January 21.  The records showed Brown calling Sellers at 10:34, 10:45, 10:50, 11:23, and 11:29 p.m. on January 21.  When asked if the break in the phone calls between 10:50 and 11:23 p.m. corresponded to the time of Victim's murder, First Sergeant Burns responded yes, "[i]t was a window we were notified of a shooting in progress."  Records also showed Davis calling Sellers at 10:48 p.m. on January 21 and 12:25 a.m. on January 22.  On cross-examination, First Sergeant Burns confirmed he heard during an interview that Davis and Brown were good friends.  He also agreed Brown and Victim never called one another or sent text messages to each other.

SLED Lieutenant Christopher Johnson testified he analyzed Davis's and Brown's cell phone location information obtained from their cell phone records using cell phone towers to establish mapping records.  He testified Brown's cell phone record showed the phone was in Marlboro County at 7:01, 7:57, and 7:59 p.m. on January 21.  It also showed Brown's phone at a different location in Marlboro County at 8:24 and 9:46 p.m.  Lieutenant Johnson believed Brown's phone changed which towers it was utilizing because the phone was traveling.  Lieutenant Johnson provided the phone "was moving around in [Marlboro County] a good bit" based on the phone's use of several towers.  Lieutenant Johnson further testified the record showed Brown's phone in Chesterfield County, moving closer to Hillian-Edwards Road, at 10:34 p.m. on January 21.  Lieutenant Johnson indicated the record placed the phone in Chesterfield County at 10:50 p.m.  He testified Brown's cell phone location information put his phone "in the vicinity that would be consistent with Hillian-Edwards Road."  Lieutenant Johnson stated Brown's phone record showed locations in Marlboro County again at 11:17 and 11:23 p.m., on January 21 and 1:22 a.m. on January 22.

After the State rested its case, Brown moved for a directed verdict.  Brown argued no evidence had been presented he committed an overt act or acted in furtherance of any common scheme or plan, as was required for culpability under the theory that a hand of one is the hand of all.  The trial court denied the motion.  The court found the evidence presented of Brown continuing from the mistaken location to Victim's actual home, the testimony about "the box," and the cell phone evidence demonstrating Brown traveled across the county line provided sufficient evidence to deny the directed verdict motion.  Brown renewed his motion after waiving his right to testify, and the trial court again denied it.  Following deliberations, the jury convicted Brown of murder.  The trial court sentenced him to thirty-five years' imprisonment.  This appeal followed.

## STANDARD OF REVIEW

"In criminal cases, the appellate court sits to review errors of law only." *State v. Baccus*, 367 S.C. 41, 48, 625 S.E.2d 216, 220 (2006). Thus, an appellate "[c]ourt is bound by the trial court's factual findings unless they are clearly erroneous." *Id.*

## LAW/ANALYSIS

### I. Search Warrant

Brown argues the trial court erred in denying his motion to suppress his cell phone records seized pursuant to a search warrant because the State failed to produce the probable cause necessary for a search warrant. He contends the search-warrant affidavit was vague and overbroad and the State stipulated that the one specific allegation in the affidavit—that Brown's phone called Victim's phone before the murder—was false. We disagree.

"The admission of evidence is within the discretion of the trial court and will not be reversed absent an abuse of discretion." *State v. Pagan*, 369 S.C. 201, 208, 631 S.E.2d 262, 265 (2006). "An abuse of discretion occurs when the conclusions of the trial court either lack evidentiary support or are controlled by an error of law." *Id.*; *see also State v. Wise*, 359 S.C. 14, 21, 596 S.E.2d 475, 478 (2004) ("The admission or exclusion of evidence . . . will not be disturbed in the absence of a manifest abuse of discretion accompanied by probable prejudice.").

"[A]ppellate review of a motion to suppress based on the Fourth Amendment involves a two-step analysis." *State v. Frasier*, 437 S.C. 625, 633, 879 S.E.2d 762, 766 (2022). "This dual inquiry means we review the trial court's factual findings for any evidentiary support, but the ultimate legal conclusion . . . is a question of law subject to de novo review." *Id.* at 633-34, 879 S.E.2d at 766.

"The Fourth Amendment guarantees a person the right to be secure from unreasonable searches and seizures." *State v. Vickery*, 399 S.C. 507, 514-15, 732 S.E.2d 218, 221 (Ct. App. 2012) (citing U.S. Const. amend. IV). "Evidence seized in violation of the Fourth Amendment must be excluded from trial." *State v. Weaver*, 374 S.C. 313, 319, 649 S.E.2d 479, 482 (2007). "A search or seizure is reasonable under the Fourth Amendment when it is authorized by a warrant that is supported by probable cause." *State v. Crummey*, 443 S.C. 94, 107, 902 S.E.2d 391, 398 (Ct. App. 2024) (quoting *State v. Dill*, 423 S.C. 534, 542, 816 S.E.2d 557, 562 (2018)).

"In South Carolina, the statutory warrant requirement is separate and distinct from the prohibition in the federal and state constitutions against unreasonable searches and seizures." *State v. Covert*, 368 S.C. 188, 195, 628 S.E.2d 482, 486 (Ct. App. 2006) (citing S.C. Code Ann. § 17-13-140 (2014); U.S. Const. amend. IV; S.C. Const. art. I, § 10), *aff'd as modified*, 382 S.C. 205, 675 S.E.2d 740 (2009). "The Constitutions of the United States and the State of South Carolina require that search warrants be 'supported by oath or affirmation.'" *State v. McKnight*, 291 S.C. 110, 112, 352 S.E.2d 471, 472 (1987) (quoting U.S. Const. amend. IV; S.C. Const. art. I, § 10). "This is a minimum standard, and state legislatures are free to enact stricter requirements for the issuance of search warrants." *Id.* at 113, 352 S.E.2d at 472. Section "17-13-140 imposes stricter requirements than does the Fourth Amendment." *State v. Herring*, 387 S.C. 201, 214, 692 S.E.2d 490, 497 (2009). "A search warrant that would survive constitutional scrutiny may still be defective under [section 17-13-140 of the South Carolina Code]." *McKnight*, 291 S.C. at 113, 352 S.E.2d at 472.

Section 17-13-140, often referred to as the search warrant statute, allows search warrants to "be issued 'only upon affidavit sworn to before the magistrate . . . establishing the grounds for the warrant.'" *State v. Bellamy*, 336 S.C. 140, 143, 519 S.E.2d 347, 348 (1999) (omission in original) (quoting § 17-13-140). That section provides in pertinent part:

> Any magistrate . . . may issue a search warrant to search for and seize . . . (3) property which . . . has been used in the commission of a criminal offense or . . . is concealed to prevent a criminal offense from being discovered; (4) property constituting evidence of crime or tending to show that a particular person committed a criminal offense; . . . .
>
> . . . .
>
> A warrant issued hereunder shall be issued only upon affidavit sworn to before the magistrate . . . establishing the grounds for the warrant. If the magistrate . . . abovementioned is satisfied that the grounds for the application exist or that there is probable cause to believe that they exist, he shall issue a warrant . . . .

S.C. Code Ann. § 17-13-140.

"A magistrate may issue a search warrant only upon a finding of probable cause." *Dupree*, 354 S.C. at 684, 583 S.E.2d at 441. A search-warrant "affidavit must contain sufficient underlying facts and information upon which the magistrate may make a determination of probable cause." *State v. Gore*, 408 S.C. 237, 247, 758 S.E.2d 717, 722 (Ct. App. 2014) (quoting *State v. Philpot*, 317 S.C. 458, 461, 454 S.E.2d 905, 907 (Ct. App. 1995)). "The magistrate should determine probable cause based on all of the information available to the magistrate at the time the warrant was issued." *Dupree*, 354 S.C. at 684, 583 S.E.2d at 441. "A warrant is supported by probable cause if, given the totality of the circumstances set forth in the affidavit, there is a fair probability that . . . evidence of a crime will be found in a particular place." *Crummey*, 443 S.C. at 107, 902 S.E.2d at 398 (quoting *State v. Kinloch*, 410 S.C. 612, 617, 767 S.E.2d 153, 155 (2014)). "'The term "probable cause" does not import absolute certainty. Rather, in determining whether a search warrant should be issued, magistrates are concerned with probabilities and not certainties.'" *Id.* (quoting *Dupree*, 354 S.C. at 683, 583 S.E.2d at 441).

"The veracity and the basis of knowledge of persons supplying the information in a search-warrant affidavit are considerations in the determination of whether there is probable cause to issue a search warrant." *State v. Robinson*, 415 S.C. 600, 605, 785 S.E.2d 355, 357 (2016). "Sworn oral testimony is permissible to supplement search[-]warrant affidavits [that] are facially insufficient to establish probable cause." *Crummey*, 443 S.C. at 107, 902 S.E.2d at 398 (quoting *Dill*, 423 S.C. at 542, 816 S.E.2d at 562); *see also Herring*, 387 S.C. at 214, 692 S.E.2d at 497 ("[A] 'search[-]warrant affidavit which itself is insufficient to establish probable cause may be supplemented before the magistrate by sworn oral testimony.'" (quoting *McKnight*, 291 S.C. at 113, 352 S.E.2d at 472)).

"An appellate court reviewing the decision to issue a search warrant should decide whether the magistrate had a substantial basis for concluding probable cause existed." *Dupree*, 354 S.C. at 683, 583 S.E.2d at 441. "This review, like the determination by the magistrate, is governed by the 'totality of the circumstances' test." *Id.* (quoting *State v. Jones*, 342 S.C. 121, 126, 536 S.E.2d 675, 678 (2000)). "In determining the validity of the warrant, a reviewing court may consider only information brought to the magistrate's attention." *Id.* at 684, 583 S.E.2d at 441. "An appellate court gives great deference to the issuing judge's probable cause determination." *Robinson*, 415 S.C. at 605, 785 S.E.2d at 357. "Searches based on warrants will be given judicial deference to the extent that an otherwise marginal search may be justified if it meets a realistic standard of probable cause." *Dupree*,

354 S.C. at 683-84, 583 S.E.2d at 441. "We are mindful on review that affidavits are not meticulously drawn by lawyers, but are normally drafted by non-lawyers in the haste of a criminal investigation, and should therefore be viewed in 'a common sense and realistic fashion.'" *Gore*, 408 S.C. at 247, 758 S.E.2d at 722 (quoting *State v. Sullivan*, 267 S.C. 610, 617, 230 S.E.2d 621, 624 (1976)). "Our task is to decide whether the magistrate had a substantial basis for concluding probable cause existed." *Id.*

In *State v. Baccus*, our supreme court determined a magistrate improperly issued a search warrant when the search-warrant affidavit was defective. 367 S.C. 41, 52, 625 S.E.2d 216, 222 (2006). The court explained the affidavit failed "to set forth any facts as to why police believed [the defendant] committed the crime. The language in the affidavit lack[ed] specifi[ci]ty and contain[ed] conclusory statements." *Id.* The court concluded that under the totality of the circumstances, "the issuing magistrate did not have a substantial basis to find probable cause." *Id.* The supreme court held a search-warrant "affidavit must set forth particular facts and circumstances underlying the existence of probable cause to allow the magistrate to make an independent evaluation of the matter." *Id.* at 50-51, 625 S.E.2d at 221. Similarly, in *State v. Smith*, our supreme court determined an affidavit was defective because it "set[ ] forth no facts as to *why* police believed" the defendant had committed the robbery. 301 S.C. 371, 373, 392 S.E.2d 182, 183 (1990). The court provided, "Mere conclusory statements [that] give the magistrate no basis to make a judgment regarding probable cause are insufficient." *Id.*; *see also State v. Weston*, 329 S.C. 287, 291-92, 494 S.E.2d 801, 803 (1997) (holding a search-warrant affidavit could not have provided a substantial basis for finding probable cause to search the defendant's car when "the affidavit failed to set forth any facts as to why police believed" the defendant committed the crime and a large part of the affidavit consisted of conclusory statements).

"Under the Fourth and Fourteenth Amendments to the United States Constitution, a defendant has the right to challenge false statements in a search-warrant affidavit." *Robinson*, 415 S.C. at 606, 785 S.E.2d at 358. "In order to obtain relief, the defendant must prove the affiant knowingly and intentionally, or with reckless disregard for the truth, included false statements in the search-warrant affidavit. The burden is on the defendant to establish the falsity by a preponderance of the evidence." *Id.*

"In *Franks v. Delaware*,[7] the United States Supreme Court held that the Fourth and Fourteenth Amendments gave a defendant the right in certain circumstances to challenge the veracity of a warrant affidavit after the warrant had been issued and executed." *State v. Brown*, 437 S.C. 550, 570, 878 S.E.2d 364, 375 (Ct. App. 2022) (quoting *State v. Missouri*, 337 S.C. 548, 553, 524 S.E.2d 394, 396 (1999)). "This challenge may be based on false information being included in the search[-]warrant affidavit . . . ." *Gore*, 408 S.C. at 244, 758 S.E.2d at 720.

> [W]he[n] the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment, as incorporated in the Fourteenth Amendment, requires that a hearing be held at the defendant's request.

*Brown*, 437 S.C. at 570-71, 878 S.E.2d at 375 (first alteration in original) (quoting *Franks*, 438 U.S. at 154).

"*Franks* outlined a two-prong test for challenging the veracity of a search[-]warrant affidavit." *Gore*, 408 S.C. at 244, 758 S.E.2d at 721 (citing *Franks*, 438 U.S. at 155-56). "First, to mandate an evidentiary hearing, there must be 'allegations of deliberate falsehood or of reckless disregard for the truth [as to statements included in the warrant affidavit], and those allegations must be accompanied by an offer of proof.'" *Id.* (alteration in original) (quoting *Franks*, 438 U.S. at 171). "At the hearing, the accused has the burden of proving the allegations of perjury or reckless disregard for the truth by a preponderance of the evidence." *Id.*

"Second, if a deliberate falsehood or a reckless disregard for the truth has been established, the court must exclude the false material and consider the remainder of the affidavit to determine if it is sufficient to establish probable cause." *Id.* at 245, 758 S.E.2d at 721. "If the court determines no probable cause exists after the false material is omitted from the analysis, 'the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.'" *Id.* (quoting *State v. Davis*, 354 S.C. 348, 360, 580 S.E.2d 778, 784 (Ct. App. 2003)).

---

[7] *Franks v. Delaware*, 438 U.S. 154 (1978).

The *Franks* Court provided, "To mandate an evidentiary hearing, the challenger['s] attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof . . . ." *Missouri*, 337 S.C. at 554, 524 S.E.2d at 397 (quoting *Franks*, 438 U.S. at 171). "If these requirements are met, and if, when [the] material that is [the] subject of the alleged falsity or reckless[] disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." *Id.* (quoting *Franks*, 438 U.S. at 171-72).

In this case, Brown argues the search-warrant affidavit did not establish probable cause because the one specific allegation in the affidavit—that Brown's phone called Victim's phone before the murder—was false. The State does not dispute the search-warrant affidavit included a statement that the State later stipulated was not true—that Victim had received several phone calls from that phone number minutes before his murder. The State stipulated during the pretrial hearing that Brown's phone number never called Victim. However, when an affidavit contains a statement the defendant alleges should be excluded because it is false, the proper avenue to make that challenge is through a *Franks* hearing. *See Gore*, 408 S.C. at 244, 758 S.E.2d at 721 ("*Franks* outlined a two-prong test for challenging the veracity of a search[-]warrant affidavit." (citing *Franks*, 438 U.S. at 155-56)). Brown made no showing the false information was provided intentionally or recklessly. *See Robinson*, 415 S.C. at 606, 785 S.E.2d at 358 ("In order to obtain relief, the defendant must prove the affiant knowingly and intentionally, or with reckless disregard for the truth, included false statements in the search-warrant affidavit."); *Gore*, 408 S.C. at 244, 758 S.E.2d at 721 ("[T]here must be 'allegations of *deliberate falsehood or of reckless disregard for the truth* . . . , and those allegations must be accompanied by an offer of proof.'" (emphasis added) (quoting *Franks*, 438 U.S. at 171)); *id.* at 245-46, 758 S.E.2d at 721 (agreeing with a defendant that an affidavit improperly omitted information but noting the omission did not per se invalidate the search warrant and the defendant had to make a preliminary showing that the affiant included a deliberate falsehood or recklessly disregarded the truth to mislead the magistrate). As the defendant, Brown had the burden of making that showing. *See Gore*, 408 S.C. at 244, 758 S.E.2d at 721 ("[T]he accused has the burden of proving the allegations of perjury or reckless disregard for the truth by a preponderance of the evidence."); *see also State v. Porch*, 417 S.C. 619, 627, 790 S.E.2d 440, 444 (Ct. App. 2016) ("A party attempting to demonstrate information was intentionally or recklessly omitted from an affidavit bears a heavy burden of proof." (quoting *State v. Lynch*, 412 S.C. 156, 179, 771 S.E.2d 346, 358 (Ct. App. 2015))). Brown did not attempt to make that

showing here; he only demonstrated the statement was false. Accordingly, this court must review the affidavit with the false statement included when deciding whether the magistrate had probable cause to issue the warrant.

Additionally, Brown argues the search warrant-affidavit was vague and overbroad. Captain Jordan provided in the affidavit that Victim received several phone calls from the phone number minutes before he was shot; the affidavit also provided an explanation of how cell phone records can link a suspect to a crime scene. As described above, this court considers the affidavit on its face, including the false statement, and any supplemental testimony given to the magistrate. *See Crummey*, 443 S.C. at 107, 902 S.E.2d at 398 ("Sworn oral testimony is permissible to supplement search[-]warrant affidavits [that] are facially insufficient to establish probable cause." (quoting *Dill*, 423 S.C. at 542, 816 S.E.2d at 562)). Captain Jordan supplemented the affidavit with testimony in front of the magistrate when applying for the warrant. The supplemental testimony added that the specific phone calls mentioned in the affidavit were associated with numerous threats to Victim. The affidavit and supplemental testimony contain what the crime was, when the crime occurred, and some information regarding why Captain Jordan believed that phone number's records would contain evidence about the crime. *See State v. Thompson*, 419 S.C. 250, 256-57, 797 S.E.2d 716, 719 (2017) (providing the magistrate must decide "whether, under the totality of the circumstances set forth in the affidavit, *there is a fair probability that evidence of a crime will be found in the particular place to be searched*"); *cf. Weston*, 329 S.C. at 291-92, 494 S.E.2d at 803 (concluding a search-warrant affidavit could not have provided a substantial basis for finding probable cause for a search when "the affidavit failed to set forth any facts as to why police believed" the defendant committed the crime); *Smith*, 301 S.C. at 373, 392 S.E.2d at 183 (determining an affidavit was defective because it "set[ ] forth no facts as to *why* police believed" the defendant had committed the crime). The information combined from the affidavit and the testimony were sufficient to demonstrate probable cause to the magistrate. Accordingly, the trial court did not err in denying Brown's motion to suppress the cell phone records for his phone number.

## II.   Directed Verdict

Brown contends the trial court erred in denying his motion for a directed verdict because no direct or substantial circumstantial evidence was presented to establish Brown committed any overt act under the theory of accomplice liability to aid or abet another person or persons in killing Victim. We disagree.

"When ruling on a motion for a directed verdict, the trial court is concerned with the existence or nonexistence of evidence, not its weight." *State v. Weston*, 367 S.C. 279, 292, 625 S.E.2d 641, 648 (2006). When reviewing a trial court's denial of a defendant's motion for a directed verdict, an appellate court must view the evidence in the light most favorable to the State. *State v. Venters*, 300 S.C. 260, 264, 387 S.E.2d 270, 272 (1990). Additionally, an appellate court must find the trial court properly submitted a case to the jury if any direct evidence or any substantial circumstantial evidence reasonably tended to prove the guilt of the accused. *Weston*, 367 S.C. at 292-93, 625 S.E.2d at 648. "A case should be submitted to the jury when the evidence is circumstantial 'if there is any substantial evidence which reasonably tends to prove the guilt of the accused or from which his guilt may be fairly and logically deduced.'" *State v. Bostick*, 392 S.C. 134, 139, 708 S.E.2d 774, 776 (2011) (quoting *State v. Mitchell*, 341 S.C. 406, 409, 535 S.E.2d 126, 127 (2000)). "[T]he trial court should grant a directed verdict motion when the evidence presented merely raises a suspicion of guilt." *Id.* at 142, 708 S.E.2d at 778. "Circumstantial evidence . . . gains its strength from its combination with other evidence, and all the circumstantial evidence presented in a case must be considered together to determine whether it is sufficient to submit to the jury." *State v. Rogers*, 405 S.C. 554, 567, 748 S.E.2d 265, 272 (Ct. App. 2013). "[W]hen the State relies exclusively on circumstantial evidence and a motion for a directed verdict is made, the trial [court] is concerned with the existence or non-existence of evidence, not with its weight." *State v. Pearson*, 415 S.C. 463, 469, 783 S.E.2d 802, 805 (2016).

When considering a directed verdict motion, the trial court must view the evidence in the light most favorable to the State and submit the case to the jury if any substantial evidence "reasonably tends to prove the guilt of the accused" or if any substantial evidence exists "from which his guilt may be fairly and logically deduced." *State v. Bennett*, 415 S.C. 232, 236-37, 781 S.E.2d 352, 354 (2016) (quoting *State v. Littlejohn*, 228 S.C. 324, 329, 89 S.E.2d 924, 926 (1955)). "[T]he court must concern itself solely with the existence or non-existence of evidence from which a jury could reasonably infer guilt. This objective test is founded upon reasonableness." *Id.* at 237, 781 S.E.2d at 354 (emphasis omitted). "Accordingly, in ruling on a directed verdict motion whe[n] the State relies on circumstantial evidence, the court must determine whether the evidence presented is sufficient to allow a reasonable juror to find the defendant guilty beyond a reasonable doubt." *Id.*

"Ordinarily, the State convicts a defendant of a crime by proving that he personally committed the criminal act." *State v. Johnson*, 444 S.C. 442, 449, 908 S.E.2d 102,

105-06 (2024) (quoting *State v. Sellers*, 442 S.C. 140, 148, 898 S.E.2d 116, 120 (2024)). "The law of accomplice liability provides, however, that a person may be guilty of a crime even though he did not personally commit the criminal act." *Id.* at 449, 908 S.E.2d at 106. "The doctrine of accomplice liability arises from the theory that 'the hand of one is the hand of all.'" *State v. Reid*, 408 S.C. 461, 472, 758 S.E.2d 904, 910 (2014) (quoting 23 S.C. Jur. *Homicide* § 22.1 (2014)). "Under this theory, one who joins with another to accomplish an illegal purpose is liable criminally for everything done by his confederate incidental to the execution of the common design and purpose." *Id.* "In a murder case, . . . if two people plan or agree to commit the murder, and both of them are present at the scene of the crime, but only one of them actually shoots and kills the victim, both participants in the plan or agreement are nevertheless guilty of the murder." *Johnson*, 444 S.C. at 449, 908 S.E.2d at 106.

"A person must personally commit the crime or be present at the scene of the crime and intentionally, or through a common design, aid, abet, or assist in the commission of that crime through some overt act to be guilty under a theory of accomplice liability." *Reid*, 408 S.C. at 472-73, 758 S.E.2d at 910. "Mere presence at the scene is not sufficient to establish guilt as an aider or abettor." *State v. Mattison*, 388 S.C. 469, 480, 697 S.E.2d 578, 584 (2010) (quoting *State v. Leonard*, 292 S.C. 133, 137, 355 S.E.2d 270, 272 (1987)). "[T]he State must present evidence the participant knew of the principal's criminal conduct." *Reid*, 408 S.C. at 473, 758 S.E.2d at 910. "[P]resence at the scene of a crime by pre-arrangement to aid, encourage, or abet in the perpetration of the crime constitutes guilt as a principle." *Mattison*, 388 S.C. at 480, 697 S.E.2d at 584 (quoting *State v. Hill*, 268 S.C. 390, 395-96, 234 S.E.2d 219, 221 (1977)); *see also id.* ("Any person who is present at a homicide, aiding and abetting, is guilty of the homicide as a principal, even though another does the killing." (quoting *State v. Zeigler*, 364 S.C. 94, 103, 610 S.E.2d 859, 864 (Ct. App. 2005))). "If 'a person was present abetting while any act necessary to constitute the offense [was] being performed through another, he could be charged as a principal—even though [that act was] not the whole thing necessary.'" *Reid*, 408 S.C. at 473, 758 S.E.2d at 910 (alterations in original) (emphases omitted) (quoting *Rosemond v. United States*, 572 U.S. 65, 72 (2014)).

"Accomplice liability can be proven by circumstantial evidence." *State v. Campbell*, 443 S.C. 182, 193, 904 S.E.2d 441, 446 (2024). "In order to establish the parties agreed to achieve an illegal purpose, thereby establishing presence by pre-arrangement, the State need not prove a formal expressed agreement, *but rather can prove the same by circumstantial evidence and the conduct of the*

*parties.*"  *Id.* at 193, 904 S.E.2d at 447 (quoting *State v. Gibson*, 390 S.C. 347, 354, 701 S.E.2d 766, 770 (Ct. App. 2010)).

The trial court did not err in denying Brown's motion for a directed verdict.  The evidence when viewed in the light most favorable to the State amounted to substantial circumstantial evidence that Brown was involved in a common scheme or plan.  Neighbor identified[8] Brown as being present in Victim's yard at the time of Victim's murder and confirmed he was an "active participant."  Brown's cell phone location data was consistent with being at the crime scene around the time of the murder.  Although no one testified they saw him with a weapon, when he was in Neighbor's yard, multiple people around him had firearms, which they loaded while standing in the yard.  Brown then got back in the car with some of those people, rode to Victim's new address, exited the car there, and stayed with the group.  Staying with the group after they loaded their weapons and then traveling to the correct location amounted to evidence of an overt act by Brown, showing he was acting in concert with the group.  Additionally, he traveled with the group to the mobile home park from Marlboro County and texted frequently leading up to the time of Victim's murder with others identified as being involved in the murder.  *See Mattison*, 388 S.C. at 480, 697 S.E.2d at 584 ("[P]resence at the scene of a crime by pre-arrangement to aid, encourage, or abet in the perpetration of the crime constitutes guilt as a principle." (quoting *Hill*, 268 S.C. at 395-96, 234 S.E.2d at 221)).  Accordingly, we affirm the trial court's denial of Brown's motion for a directed verdict.

---

[8] Although Brown questions the reliability of Neighbor's identification in his appellant's brief while attacking the sufficiency of the evidence, he does not challenge the admission of the identification as a separate issue on appeal.  Thus, any argument on the admission of the identification is abandoned.  *See R & G Constr., Inc. v. Lowcountry Reg'l Transp. Auth.*, 343 S.C. 424, 437, 540 S.E.2d 113, 120 (Ct. App. 2000) ("An issue is deemed abandoned if the argument in the brief is only conclusory."); *see also Jones v. Leagan*, 384 S.C. 1, 17, 681 S.E.2d 6, 15 (Ct. App. 2009) ("An issue that is not argued in the brief is deemed abandoned and precludes consideration on appeal.").  During Neighbor's testimony in front of the jury, she identified Brown in the courtroom as being the person she recognized from outside her home and Victim's home at the time of the murder.  Neighbor explained she initially had been unable to pick Brown out of a photo lineup because multiple people in the lineup looked similar.  On cross-examination, she stated she had identified Brown prior to the photo lineup when law enforcement showed her a photo of him taken from social media.

**CONCLUSION**

Accordingly, the trial court did not err in denying the motion to suppress the information received as a result of the search warrant for Brown's cell phone records.  Additionally, the trial court did not err in denying Brown's motion for a directed verdict.[9]  Therefore, Brown's conviction and sentence is

**AFFIRMED.**

**VINSON, J., concurs.**

**MCDONALD, J., concurring in result only.**


With the greatest respect to my colleagues, I must write separately because the warrant affidavit in this case was vague, overbroad, and lacking in the specifics necessary to allow the issuing magistrate to make a proper determination of probable cause.  As the majority opinion recognizes, this affidavit contained one specific allegation, and the State stipulated during the pretrial hearing that this allegation was false.  Captain Jordan's testimony in no way alleviated these concerns—rather, his testimony revealed he lacked the knowledge necessary to have adequately supplemented the defective affidavit with the "sworn oral testimony" contemplated by our jurisprudence.  *See*, *e.g.*, *State v. Warner*, 436 S.C. 395, 404–05, 872 S.E.2d 638, 642–43 (2022) (finding affidavit attached with warrant request "provided the magistrate no facts or circumstances whatsoever" to support a finding of probable cause and remanding for determination of whether magistrate properly required requesting detective to supplement with sworn testimony).

---

[9] The State makes arguments for affirming Brown's issues on appeal that are essentially additional sustaining grounds the State did not raise at trial.  Because we affirm both of Brown's issues based on the merits, we decline to reach any of these arguments by the State.  *See Walterboro Cmty. Hosp. v. Meacher*, 392 S.C. 479, 493, 709 S.E.2d 71, 78 (Ct. App. 2011) (declining to address additional sustaining grounds when affirming on other grounds); *see also Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (providing an appellate court need not review the remaining issues when its determination of a prior issue is dispositive of the appeal).

Under the circumstances of this case, however, I would find that the requesting officers acted in good faith in seeking the warrant for Brown's phone and cell site location data (CSLI). As the majority acknowledges, the affidavit inaccurately states that on the evening of January 21, 2017, the victim "received several phone calls from the target number minutes before his murder." An accurate statement would have explained that on the day of the murder, Brown called victim's cousin (Smalls a/k/a S-Dot), Smalls forwarded Brown's number to victim, and Brown called Smalls again just minutes before the group of men gunned down the victim. Moreover, a witness positively identified Brown as a member of the group who came into the neighborhood that night loudly hunting for the victim. Had *this* information been provided to the magistrate, his probable cause determination would have been sound.

But there is another reason to decline to suppress Brown's phone data and CSLI obtained from his Verizon records. Law enforcement obtained this warrant on January 24, 2017, some seventeen months before the Supreme Court's *Carpenter* decision. *See Carpenter v. United States*, 585 U.S. 296, 319 (2018) (narrowly addressing seven days of CSLI obtained without a warrant and holding that "even though the Government will generally need a warrant to access CSLI, case-specific exceptions may support a warrantless search of an individual's cell-site records under certain circumstances"). The State persuasively argues that this warrant sought only two days of data and urges us to recognize law enforcement's good faith attempt to obtain a proper warrant during the pre-*Carpenter* era when no warrant was required. *See e.g.*, *State v. Carter*, 445 S.C. 157, 163–64, 912 S.E.2d 264, 268 (2025) (holding the good faith exception to the exclusionary rule "forecloses suppression" when officers acted pursuant to the federal Stored Communications Act, 18 U.S.C. § 2702(c)(4), in obtaining real time cell site location information); *see also United States v. Leon*, 468 U.S. 897, 918–21 (1984) (finding the good faith exception permits admission of evidence where an officer reasonably relies upon a warrant later determined to lack probable cause); *United States v. Chavez*, 894 F.3d 593, 608 (4th Cir. 2018) (recognizing the purpose of the exclusionary rule—to deter future Fourth Amendment violations—is not served when investigators act "with an objectively reasonable good-faith belief that their conduct is lawful").

For these reasons, while I cannot agree that this warrant properly issued based upon the scant, erroneous information provided to the magistrate, I do agree with the State as to the application of the good faith exception to the exclusionary rule. Thus, like the majority, I would affirm Brown's conviction and sentence.